SAMUEL C. GARDNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gardner v. Commissioner
Docket Nos. 21684-82; 20944-82.
United States Tax Court
T.C. Memo 1987-420; 1987 Tax Ct. Memo LEXIS 417; 54 T.C.M. (CCH) 250; T.C.M. (RIA) 87420; August 25, 1987. Hallison H. Young and Frederick A. Patmon, for the petitioner. Oksana O. Xenos, for the *420 respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Additions
Docket No.
Year
Deficiency
Sec. 6651(a) [1]
Sec. 6653(a)
21684-82
1977
$ 49,289.00
[2]
29044-82
1978
2,880.70
$ 144.04
1979
1,355.00
67.75   The issues for decision [3] are: (1) Whether petitioner, a limited partner in Boulevard *421 East Apartments Limited Dividend Housing Association, defaulted in the payment of his required capital contributions to the partnership, resulting in the forfeiture of his partnership interest effective January 1, 1977, so that he was not entitled to deduct a partnership loss for that year; (2) Whether petitioner realized a capital gain in 1977 as a result of his release from partnership liabilities upon the forfeiture of his partnership interest; (3) Whether petitioner had unreported income of $ 12,115.98, $ 4,200.00, and $ 5,803.00 in his taxable years 1977, 1978, and 1979, respectively; (4) Whether petitioner is entitled to a claimed $ 500 charitable contribution deduction for 1978; (5) Whether petitioner is entitled to a dependency exemption for his minor son for 1977, 1978, and 1979; and, (6) Whether petitioner is liable for the additions to tax under section 6651(a) for 1977, and under section 6653(a) for 1978 and 1979. *422 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first stipulation of facts, the third stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. [4]
Petitioner Samuel C. Gardner resided in Detroit, Michigan at the time each petition was filed in these consolidated cases. Petitioner's occupation during each of the taxable years in issue was that of Judge of the Recorders Court for the city of Detroit. Petitioner filed his U.S. Individual Income Tax Returns (Forms 1040) for the calendar years 1977, 1978, and 1979 with the Internal Revenue Service Center in Cincinnati, Ohio, as follows: Taxable Year
Date of Filing
1977   10/16/78
1978   10/16/79
1979   06/16/80
1979 (Amended)   06/04/81
1979 (Amended)   04/20/83
Applications for extensions of time to file were filed for the 1978 and 1979 returns, but no *423 such application was filed for the 1977 return. I. The Partnership
On March 12, 1971, William H. Williams and Nellie T. Williams, his wife, executed a nonrecourse mortgage and mortgage note evidencing a debt of $ 459,000 to Inner City Mortgage Corporation, secured by the real property located at 190 East Grand Boulevard, Detroit, Michigan. The proceeds of the loan were used to rehabilitate the building on the property, known as Boulevard East Apartments. On the same date, the Williamses and the Secretary of the U.S. Department of Housing and Urban Development (HUD) entered into a Regulatory Agreement under section 236 of the National Housing Act, as amended, wherein HUD agreed to provide mortgage insurance on the property. On April 19, 1972, the Williamses and Inner City Mortgage Corporation executed a nonrecourse supplemental mortgage and mortgage note for an additional $ 32,300, which was contemporaneously consolidated with the original $ 459,000 mortgage. On December 28, 1972, "Boulevard East Apartments" was organized under the laws of Michigan as a limited partnership. [5] The partnership was organized with two general partners, William H. Williams and Nellie T. Williams, *424 and one limited partner, Edward J. Holland, Jr. Under the partnership agreement, profits and losses were to be apportioned five percent to the general partners and 95 percent to the limited partner. The general partners' capital contribution to the partnership was their entire interest in the real property located at 190 East Grand Boulevard, Detroit, Michigan and their entire interest in the commitment for mortgage insurance from HUD and the Commissioner of the Federal Housing Administration. The purpose of the partnership was to acquire the property located at 190 East Grand Boulevard, Detroit, Michigan (hereinafter referred to as the "property") in order to rehabilitate, construct, develop, and manage the property under section 236 of the National Housing Act, as amended. This property was a housing project for persons of low or moderate incomes. On December 27, 1973, the *425 partnership agreement was amended to admit four additional limited partners, James Del Rio, Douglas Strong, Lemuel Barney, and petitioner. The amended partnership agreement provided that neither the partnership nor any partner was to have any personal liability for the mortgage encumbering the partnership's property, i.e., the housing project. That nonrecourse mortgage was included in the basis for depreciation deductions claimed by the partnership. Each of the additional limited partners, including petitioner, acquired a 22.5 percent interest in the net profits and losses of the partnership, which was subsequently modified to 23.5 percent. In return for their interests, the additional limited partners each agreed to contribute $ 25,000 to the partnership, payable as follows: $ 12,500 upon execution of the partnership agreement, $ 4,167 on or before December 1, 1974, $ 4,167 on or before December 1, 1976. Petitioner executed a promissory note evidencing the $ 12,500 balance of his required capital contributions to the partnership. With regard to the default of any limited partner in his required capital contributions, section 4.10 of the partnership agreement provided as follows: *426 4.10 Defaulting Limited Partner
In the event that any Investor Limited Partner shall default in the payment of any of the installments required to be paid, as aforesaid, the Defaulting Limited Partner shall forfeit his percentage interest in the Partnership capital, profits and losses and the remaining Limited Partners, if any, may acquire, pro rata, Limited Partnership interests of such Defaulting Partner, after contributing pro rata all of the balance of the cash contributions required to be made by such Defaulting Limited Partner. For purposes of this subsection, the General Partners are constituted and appointed the true and lawful attorney of any such Defaulting Limited Partner to effectuate the transfer assignment and substitution of said Defaulting Limited Partner's interest to the remaining Limited Partners upon the making of the payment, as aforesaid, or to effectuate the contraction and reduction of said Defaulting Limited Partner's interest to the Additional Limited Partners upon the making of any such agreed payment as the parties may mutually agree, and to execute any and all documents which may be required. Nothing herein provided for shall preclude the remaining *427 Limited Partners from providing a Substitute Limited Partner in the place and stead of the Defaulting Limited Partner or the Partnership from providing an Additional Limited Partner in the place and stead of the Defaulting Limited Partner upon payment as aforesaid, upon the payment by such Substitute Limited Partner of the balance of the cash contribution required to be made by the Defaulting Limited Partner; provided however, that such new Substitute Limited Partner or Additional Limited Partner shall first be approved by the General Partners and, if required by the Regulatory Agreement, the FHA.
The partnership agreement did not provide for, or require, any notice to a defaulting limited partner to effectuate the forfeiture of his partnership interest. The partnership agreement did not provide that such a forfeiture was conditioned upon any remaining limited partner's making the payment for the defaulting limited partner's share. Further, the partnership agreement did not provide that the payments of the capital contributions by the limited partners were conditioned upon the financial viability or solvency of the partnership, upon the ability of the partnership to remain current *428 on the mortgage, or upon any other circumstance or event. Petitioner paid in $ 12,500 to the partnership by his check dated December 24, 1973, in accordance with the partnership agreement and his subscription agreement. However, petitioner did not make any of the three installment payments due to the partnership on or before their due dates of December 1, 1974, 1975, and 1976. Another limited partner, James Del Rio, who executed a subscription agreement and promissory note similar to that of petitioner, also did not make the installment payments due to the partnership. Petitioner did not make his required capital contributions to the partnership in 1974, 1975, or 1976. However, during 1976 and 1977, he paid the sum of $ 12,500 for his capital contribution to his attorneys instead of to the partnership. Section 6.4 of the partnership agreement provided that the general partners had the sole right to manage the business of the partnership, and section 6.5 prohibited any limited partner from participating in or having any control over the partnership business. Petitioner's attorneys, however, told him they were not satisfied with the way the property was being managed, and they *429 decided, apparently with petitioner's acquiescence, not to pay the money to the partnership. [6] Petitioner's attorneys also represented James Del Rio. Thus, as of January 1, 1977, petitioner had only paid $ 12,500 of the $ 25,000 capital contribution he was required to make to the partnership. [7]
*430 Due to the failure of petitioner and Del Rio to make their required capital contributions, the partnership was constantly falling behind on its mortgage payments to HUD. The general partner, William H. Williams, tried without success for roughly two years to collect the delinquent capital contributions from petitioner and Del Rio. At Williams' instruction, Harry M. Clark, Jr., the managing agent of the property, sent a letter dated February 21, 1976 to Frederick A. Patmon and Hallison H. Young, petitioner's attorneys, urgently requesting a meeting of petitioner's attorneys, the limited partners, Mr. Williams, and Mr. Clark, concerning the financial position of the housing project. In the letter, Mr. Clark recited as further reasons for the meeting, "the tax implications of the limited partners not making their contributions in a timely manner," and "the possibility of a need to secure substitute limited partners." The last sentence of the letter further reiterated the general partner's "great concern in this matter" and urged petitioner's attorneys to arrange a mutually agreeable time and date to meet. Copies of the letter were sent to all the limited partners, including petitioner. *431 By return letter dated March 12, 1976, Frederick A. Patmon told Mr. Clark that neither he, Mr. Young, or the limited partners had any intention of meeting with him "in any respects." By letter dated December 20, 1976, from Mr. Clark to petitioner, Clark again advised petitioner of his obligation under the partnership agreement to make his required capital contributions. In that letter Clark, acting on behalf of the general partner, advised petitioner that he was then delinquent on all three installment payments due to the partnership, totaling $ 12,500, and requested that petitioner immediately remit the delinquent amounts to the general partner. Petitioner did not respond to this request. At trial, petitioner admitted that he was aware that Williams was trying to get the money owed by petitioner to the partnership. See n.6, supra.
John Gwizdala was the partnership's certified public accountant during the taxable years in issue, having been initially retained by Mr. Williams in late 1974 or early 1975. In addition to providing auditing and tax services, Gwizdala was retained to monitor the financial responsibility of the housing project. The project had had cash flow problems *432 from its inception, directly attributable to petitioner's and Del Rio's nonpayment of their required capital contributions. By the end of 1976, Williams told Gwizdala that he was tired of trying to collect the delinquent contributions from petitioner and Del Rio and that he wanted to oust them from the partnership. Even though Williams wanted to oust petitioner and Del Rio from the partnership in 1976, Gwizdala advised Williams that it might be too late in the year to oust them and have it effective for the 1976 year. Thus, Williams decided to oust petitioner and Del Rio from the partnership effective January 1, 1977. Allan Rein, an attorney Williams hired on a limited basis in early 1977, advised Williams that petitioner and Del Rio could be terminated from the partnership under section 4.10 of the partnership agreement. By letter dated November 22, 1977, from Gwizdala to Williams, Gwizdala discussed Williams' decision to oust petitioner and Del Rio from the partnership effective January 1, 1977, and to permit the limited partners in good standing, Douglas Strong and Lemuel Barney, to increase their respective interests from 23.5 percent to 47 percent. In advising Williams what *433 contributions should be required from Strong and Barney for their increased shares, Gwizdala stated that it should be the amounts the ousted limited partners, petitioner and Del Rio, owed to the partnership as of December 31, 1976. [8]
*434 Section 13.3 of the partnership agreement, regarding the filing of tax returns, states: Tax Returns
Within ninety (90) days after the end of each fiscal year, the General Partners shall prepare and transmit to the Partners a U.S. and a Michigan Partnership Income Tax Return with respect to such fiscal year on forms prescribed by the Internal Revenue Code of 1954, as amended, or the corresponding sections of any future Federal Internal Revenue law. (Emphasis supplied.)
In accordance with his client engagement letter, Gwizdala prepared the partnership's U.S. Partnership Return of Income (Form 1065) for the year ended December 31, 1977, which was signed and filed by the general partner, Williams. In the return, Gwizdala allocated the partnership's net loss of $ 95,420 as follows: 2.5 percent each to the two general partners, William and Nellie Williams, 1.0 percent to limited partner Edward J. Holland, Jr., 47 percent each to limited partners Douglas Strong and Lemuel Barney, and zero percent each to petitioner and James Del Rio. Gwizdala attached a statement to the return, subscribed to by general partner William H. Williams, detailing the default, forfeiture, and *435 transfer of petitioner's and Del Rio's partnership interests. That return was filed on or before April 15, 1978. By letter dated December 13, 1978, from Frederick A. Patmon, petitioner's attorney, to Gwizdala, Patmon demanded that Gwizdala prepare an amended partnership tax return for the year 1977 that reflected petitioner and Del Rio as limited partners in the partnership. [9] By return letter dated December 22, 1978, Gwizdala informed Patmon that as an independent certified public accountant he is authorized to act only in accordance with his client engagement letter, and that any request to have an amended return prepared should be directed to the general partner, Williams. Petitioner and his attorneys had already retained Vasel E. Glass, an independent self-employed accountant located in the same building as petitioner's attorneys, *436 to prepare an amended partnership return for the year 1977. Glass prepared the return for 1977 during 1978. This "amended" return was signed by petitioner Samuel C. Gardner in his alleged capacity as limited partner, and was filed with the Internal Revenue Service Center in Cincinnati, Ohio on January 8, 1980. [10] The return contained a statement that petitioner and Del Rio protested their claimed defaults from the partnership. In this return, petitioner and Del Rio are each shown as limited partners with a 22.5 percent interest in the partnership, and thus are allocated 22.5 percent of the partnership's net loss for the year. Schedule K-1 to this "amended" return allocates $ 20,507 of the partnership's net loss to petitioner. On his U.S. Individual Income Tax Return for 1977, filed on October 16, 1978, petitioner reported a loss of $ 20,507 from his interest as a limited partner in the Boulevard East Apartments Limited Dividend Housing Association. *437 Respondent, in his statutory notice of deficiency to petitioner, dated May 28, 1982, relied on the original 1977 partnership return filed by the general partner, Williams, and determined that petitioner's distributive share of the partnership's net loss for 1977 was zero. [11] Respondent also determined that in 1977 petitioner recognized a long-term capital gain under section 752(b), in the amount of $ 82,248. [12] Respondent determined that petitioner recognized this gain due to the decrease in or discharge of his share of the partnership's liabilities brought on by the forfeiture of his limited partnership interest as of January 1, 1977. *438 II. Other Issues
In the course of his examination of petitioner's income tax returns for the years 1977, 1978, and 1979, Internal Revenue Agent Algis Backaitis prepared a summary of all deposits made to petitioner's checking account with the Bank of the Commonwealth, Detroit, Michigan. The schedule was prepared from records provided to Backaitis from the bank. During the period January 1, 1977 to December 31, 1979, petitioner deposited a total of $ 149,571.95 to his Bank of the Commonwealth account, broken down as follows: Deposits
1977
1978
1979
Total
Checks
$ 51,050.58
$ 44,485.69
$ 40,695.68
$ 136,231.95
Currency
5,400.00
4,200.00
3,740.00
13,340.00
$ 56,450.58
$ 48,685.69
$ 44,435.68
$ 149,571.95
In comparing the income that petitioner reported on his returns with the amount of bank deposits made over the three years in issue, respondent sought explanation from petitioner for these deposited amounts. Petitioner's representative gave explanations to some of the deposits, but not all of them. The unexplained deposits for the three years total $ 20,055.98, and break down as follows: 1977
Date Deposited
Currency
Checks
01/07/77  $ 5,000.00
01/10/77  $ 500
01/18/77  400
01/27/77  200
02/07/77  250
02/22/77  1,500
03/01/77  89.38
03/18/77  700
04/07/77  250
144.60
05/12/77  100
05/13/77  200
05/16/77  350
06/14/77  200
07/29/77  250
10/03/77  50.00
10/24/77  432.00
12/16/77  500
12/22/77  1,000.00
$ 5,400
$ 6,715.98
1977 Total
$ 12,115.98
*439 1978
Date Deposited
Currency
Checks
01/27/78  $ 350
02/07/78  150
02/27/78  80
03/08/78  150
03/24/78  370
05/01/78  700
05/30/78  200
06/28/78  450
06/30/78  600
07/10/78  800
08/01/78  160
08/08/78  40
09/01/78  150
None
$ 4,200
None
1978 Total
$ 4,200
1979
Date Deposited
Currency
Checks
02/21/79 $ 800
04/27/79 1,000
06/15/79 400
07/26/79 100
10/05/79 400
10/16/79 700
11/06/79 340
None
1979 Total
$ 3,740
Petitioner provided respondent numerous documents relating to loans he had received during the years in issue from several banks and credit unions. Respondent traced these loans into petitioner's bank account, and all of those deposits were considered "explained." None of the unexplained deposits can be traced to these documented loans. At trial, petitioner attempted to explain some of the unexplained deposits. Petitioner testified that he had cash on hand at the beginning of 1977 in excess of $ 7,000, and at the beginning of 1979 in excess of $ 3,000. Petitioner's personal financial *440 statement as of January 21, 1977, prepared by petitioner in an effort to get a loan from the Bank of the Commonwealth, lists his "Cash on Hand and in Bank" as $ 8,000. Petitioner testified that he borrowed a sum of money from an individual in 1977, but he did not offer any documentary evidence to the Court regarding this loan. In preparing the bank deposit analysis, respondent's agent did not consider petitioner's "cash on hand" or any loans petitioner claimed to have received for which he provided no documentation, as constituting adequate explanation of the source of these deposits. In his notices of deficiency to petitioner, respondent determined that the unexplained bank deposits, totaling $ 12,115.98, $ 4,200.00, and $ 3,740.00 for the years 1977, 1978, and 1979, respectively, constituted additional taxable income to petitioner. In 1979 petitioner received income tax refunds from the State of Michigan in the amounts of $ 1,988 and $ 1,180. These refunds relate to petitioner's State of Michigan income tax returns for the years 1977 and 1978, petitioner deducted as an itemized deduction the full amount of State of Michigan income taxes that were withheld from his salary as *441 Judge of the Recorders Court for the city of Detroit. In each of those years, petitioner's "excess itemized deductions" [13] greatly exceeded the amount deducted for state income taxes paid. Thus, in 1977 and 1978, petitioner received full tax benefit for his deduction of state income taxes withheld, and any refunds with respect thereto are includable in gross income. The two refunds, totaling $ 3,168, were received by petitioner, and deposited into his account at the Bank of the Commonwealth during 1979. On his U.S. Individual Income Tax Return for 1979 (including two amended returns for that year) petitioner reported only $ 1,105 as income from state income tax refunds. In his notice of deficiency to petitioner dated September 16, 1982, respondent determined that petitioner had reportable income of $ 3,168 in 1979 relating to the state refunds, and thus increased petitioner's taxable income $ 2,063 to reflect this determined amount. Thus, the total unreported income for that year was determined to be $ 5,803 ($ 3,740 plus $ 2,063). *442 On his individual income tax return for 1978, petitioner deducted $ 500 for charitable contributions made in cash. Petitioner failed to offer any documentation in support of this deduction. In his notice of deficiency to petitioner dated September 16, 1982, respondent disallowed the claimed deduction. Petitioner was divorced in September of 1974, and his ex-wife, Jerlyn Gardner, was awarded custody of their minor son, Samuel C. Gardner II. The judgment of divorce required petitioner to make child support payments of $ 50 per week through the Friend of the Court. Petitioner's support payments to the Friend of the Court were approximately $ 4,500 for each of the years 1977, 1978, and 1979. Petitioner also paid approximately $ 1,000 in private school tuition for his son in 1977, and paid for all of his son's medical dental expenses during 1977, 1978, and 1979. In his notices of deficiency to petitioner in 1982, respondent determined that petitioner did not establish that he was entitled to a dependency exemption for his son, Samuel C. Gardner II. On May 7, 1984, Jerlyn Gardner Charles, petitioner's ex-wife, executed Multiple Support Declarations (Forms 2120) for each of *443 the year's 1977, 1978, and 1979. In these declarations, petitioner's ex-wife stated that she did not provide more than 50 percent of her son's support during any of the three years, that she understood that her son was being claimed as a dependent by petitioner during these years, and that she agreed not to claim her son as a dependent on her income tax return for any of those years. The record does not establish whether she had in fact claimed him on her returns for those years. Petitioner filed his income tax return for 1977 on October 16, 1978. Neither petitioner nor his tax advisors filed a request for an extension of time to file his 1977 return, although petitioner, even at the trial, was under the impression that his tax advisors had filed for an extension. [14] In his Answer, respondent asserted an addition to the tax under section 6651(a) due to the late filing of petitioner's 1977 return. In his notice of deficiency to petitioner dated September 16, 1982, respondent determined that part or all of the underpayment of tax determined for the years 1978 and 1979 was due to negligence or intentional disregard of the rules and regulations of the Internal Revenue Code, and *444 thus respondent determined an addition to the tax under section 6653(a) for those years. OPINION
I. Forfeiture of Limited Partnership Interest
The first issue for decision is whether petitioner forfeited his limited partnership interest in Boulevard East Apartments Limited Dividend Housing Association (the partnership) effective January 1, 1977. Petitioner acquired his partnership interest on December 27, 1973, for an agreed capital contribution of $ 25,000. Under the terms of petitioner's subscription agreement, $ 12,500 was due upon execution of the agreement, with the balance of $ 12,500 due in three equal annual installments on December 1st of 1974, 1975, and 1976. Petitioner contributed $ 12,500 upon execution of the agreement, and delivered his promissory note to the partnership for the three installments due. As of January 1, 1977, petitioner had not made any of *445 the three installment payments due the partnership under the note, despite repeated requests by the general partner, Williams, for payment. Due to the nonpayment by petitioner and another limited partner, James Del Rio, of their installment payments, the partnership had continual cash flow problems. Relying on section 4.10 of the partnership agreement, Williams decided that petitioner and Del Rio had forfeited their partnership interests since they had defaulted on their required installments. Petitioner argues that he did not default on his required capital contributions and therefore no forfeiture of his partnership interest occurred. Petitioner also argues that even of we find that he did default in his capital contributions, that the forfeiture was not effectuated in conformity with the partnership agreement and applicable state law. Section 301.7701-1(c), Proced. & Admin. Regs., states in pertinent part: Although it is the Internal Revenue Code rather than local law which establishes the tests or standards which will be applied in determining the classification in which an organization belongs, local law governs in determining whether the legal relationships which have *446 been established in the formation of an organization are such that the standards are met. Thus, it is local law which must be applied in determining such matters as the legal relationships of the members of the organization among themselves and with the public at large, and the interests of the members of the organization of its assets.
Thus, in determining whether petitioner forfeited his partnership interest, we must look to the applicable local law. Also here the partnership agreement, in section 14.6, expressly provided that it was to be construed and enforced in accordance with the laws of the State of Michigan. Title 20 of the Michigan Statutes Annotated (Mich. Stat. Ann.) covers partnerships, with sections 20.1 through 20.43 being Michigan's Uniform Partnership Act (U.P.A.), and sections 20.51 through 20.81 dealing specifically with limited partnerships. [15] (Mich. Stat. Ann. Vol. 14A, pp. 499-572) The U.P.A. (Mich. Stat. Ann. sections 20.1 through 20.43) applies to limited partnerships except insofar as it is inconsistent with the statutes dealing specifically with limited partnerships (Mich. Stat. Ann. sections 20.51 through 20.81). Mich. Stat. Ann. section 20.6(a) *447 (Callaghan 1981). Any situation not provided for in the U.P.A. or the limited partnership statutes is governed by the rules of law and equity. Mich. Stat. Ann. section 20.79. Further, the rights and duties of the partners in relation to the partnership are subject to any agreement between them. Mich. Stat. Ann. section 20.18. Petitioner first argues that his obligation to contribute $ 25,000 to the partnership was discharged in full on December 27, 1973, by his paying $ 12,500 to the partnership and by his giving a promissory note for the balance of $ 12,500. Since he gave the partnership his promissory note, petitioner claims there was no default in his required contribution, and therefore his interest in the partnership's profits and losses was absolute and not subject to any defeasance. Petitioner cites generally the partnership agreement, his subscription agreement, and Michigan law for this contention. We cannot agree. Section 20.67(1)(b) of the Michigan Statutes *448 Annotated states that a limited partner is liable to the partnership "for any unpaid contribution which he agreed in the certificate to make in the future at the time and on the conditions stated in the certificate." Moreover, section 4.10 of the partnership agreement provides that "In the event that any Investor Limited Partner shall default in the payment of any of the installments required to be paid, as aforesaid, the Defaulting Limited Partner shall forfeit his percentage interest in the Partnership capital, profits and losses * * *." We think that section 4.10 of the partnership agreement and section 20.67(1)(b) of the Michigan Statutes Annotated clearly expresses the obligation and liability on the part of the limited partners to make the installment payments due the partnership under their promissory notes. The intention of the parties as expressed in their agreement and the reasonable inferences therefrom must be controlling in the construction of a contract. Emerson v. Arnold,92 Mich. App. 345, 285 N.W. 2d 45, 51 (Ct. App. 1979). A partnership agreement is a contract. City National Bank of Detroit v. Westland Towers Apartments,107 Mich. App. 213, 309 N.W. 2d 209, 215 (Ct. App. 1981). *449 Thus, we find that petitioner's delivery of his promissory note to the partnership did not discharge his obligation to contribute the balance of the $ 25,000 for his limited partnership interest. Further, we find that the petitioner defaulted on the three installment payments due the partnership, and thus was subject to section 4.10 of the partnership agreement. Under section 4.10 of the partnership agreement, any limited partner who defaults in the payment of any of the installments required to be paid "shall forfeit his percentage interest in the Partnership capital, profits and losses * * *." Due to petitioner's default on all three of his installment payments, the general partner, Williams, determined that petitioner had forfeited his partnership interest under section 4.10 of the partnership agreement. Petitioner argues the forfeiture was not effectuated in conformity with the partnership agreement and applicable Michigan law. Specifically, petitioner contends the claimed forfeiture of his partnership interest was invalid because: (1) he received no notice of the forfeiture from the partnership or the general partners; (2) the partnership agreement was never amended in accordance *450 with Michigan law; and (3) his $ 4,111 payment to HUD on the partnership's behalf constituted a waiver of any claimed forfeiture. We will address each contention separately. Petitioner argues that the attempted forfeiture of his partnership interest was invalid since he received no oral or written notice of the forfeiture from the partnership or the general partners. Petitioner cites People v. Larson,81 Mich. App. 317, 265 N.W. 2d 134 (Ct. App. 1978), [16] for the proposition that forfeitures made without notice are void. In Larson, various Detroit Recorders Court judges ordered the forfeiture of surety bonds after the individual defendants failed to appear for trial. In each case, counsel for the surety filed petitions with a different judge for reinstatement of the bonds, and no notice was given to the prosecutor's office of these motions. Subsequently, orders for the remittance of the forfeited bonds were issued. The Court held that the orders for remittance, which were based on petitions filed without proper notice to the prosecutor's office, were void. 265 N.W. 2d at 137. This case is distinguishable from the present case. In Larson, *451 the notice requirement ran to he benefit of the prosecutor, not to the benefit of the forfeiting party, the surety. In the present case, petitioner is the forfeiting party. Thus, petitioner's reliance on Larson for his argument that the forfeiture of his partnership interest was invalid since he did not receive notice of the forfeiture from the partnership is misplaced. Moreover, the partnership agreement does not require notice to a defaulting limited partnership under section 4.10. In any event, the record establishes that petitioner had ample notice. Petitioner had been reminded repeatedly of his delinquency. As the record graphically portrays the situation, Williams "wore out a pair of shoes" trying to collect from petitioner and Del Rio. Petitioner was aware of the partnership's attempts to collect the delinquent sums from him, and he was aware that his attorneys to whom he had given the $ 12,500 balance for his capital contribution had not paid the money over to the partnership. See n.6, supra. Thus, we are satisfied that there was ample notice, assuming any such notice was required. [17]
*452 Petitioner next argues that the attempted forfeiture of his partnership interest was invalid since the partnership agreement was never amended in accordance with Michigan law. Section 20.74(2), Michigan Statutes Annotated, provides in pertinent part: (2) A certificate shall be amended when (a) There is a change in the name of the partnership or in the amount or character of the contribution of any limited partnership, [18]
* * * Subsequent to the general partner's determination that limited partners petitioner and Del Rio had forfeited their partnership interests by defaulting on their required capital contributions, the limited partners in good standing, Douglas Strong and Lemuel Barney, made additional payments to the partnership to cover petitioner's and Del Rio's default. [19] Their partnership interests increased from 23.5 percent to 47 percent. Petitioner claims that these additional payments made by Strong and Barney constituted a change "in the amount or character of the contribution" *453 of a limited partner, therefore requiring amendment of the partnership agreement under section 20.74(2)(a), Michigan Statutes Annotated. Petitioner argues that since no amendment to the partnership agreement was filed, the forfeiture of his interest was not in conformity with state law and was therefore invalid. We disagree. We think the purpose of those provisions is to protect the public, not to protect a defaulting limited partner from the consequences of his default. *454 In Hoefer v. Hall,75 N.M. 751, 411 P.2d 230 (1965), plaintiff sued defendant to recover on a $ 5,000 promissory note executed and delivered to him by the defendant for monies loaned. Simultaneously with the execution of the note, and as a part of the same transaction, the parties entered into a limited partnership agreement which required the plaintiff to pay the defendant $ 5,000 in six months in exchange for a 5 percent interest in the partnership. The parties agreed that the payment of the note would be made by the defendant's application of the money due to plaintiff's partnership contribution. After six months the payment was so applied. Plaintiff argued that since the certificate of partnership was not recorded with the state, as required by New Mexico's Uniform Limited Partnership Act, [20] the limited partnership never came into existence, and consequently no money was ever due from him under the partnership agreement. The Supreme Court of New Mexico held that the purpose of the recording requirement was to acquaint third persons dealing with the partnership with the essential features of the partnership agreement. 411 P.2d at 233. Further, *455 the Court stated that the failure to record the certificate could not affect the existence of the limited partnership insofar as the parties, inter se, were concerned, where neither the rights of the third parties nor a partner's claim of limited liability was involved. 411 P.2d at 233. We make similar interpretation of the amending and filing requirements of sections 20.74(2) and 20.75, Michigan Statutes Annotated, in the present case. These requirements are intended to acquaint and protect third persons dealing with the partnership. They are not intended to protect petitioner from forfeiting his partnership interest for failure to make his required capital contributions. Accordingly, we find the failure to file an amendment to the partnership agreement, assuming one was required, not determinative of whether a forfeiture of petitioner's partnership interest occurred. Petitioner next argues that assuming a forfeiture of his partnership interest occurred, the forfeiture *456 was subsequently waived by the partnership's accepting the benefit of his $ 4,111 payment to HUD on February 25, 1977. See n.7, supra. Petitioner cites the Supreme Court of Michigan case of Zadigian v. Gard,223 Mich. 147, 193 N.W. 783 (1923) for this contention. In Zadigian, the vendee in a land contract was in default on several payments due the vendor. The vendee then made a payment to the vendor constituting the interest owed on the contract up to a certain future date, which the vendor accepted. The court stated that the vendor, by failing to declare a forfeiture for the default in payments, and by accepting the vendee's payment of interest, had waived the right to treat time as of the essence in the performance of the contract. 193 N.W. at 784. Before expiration of that future date to which interest was paid, the vendee tendered the full amount due on his contract. 193 N.W. at 785. In that situation, there could be no forfeiture of the vendee's right and he had to be permitted to make the payment. That case is distinguishable from the present case because petitioner's payment to HUD was made after the general partner's *457 determination that petitioner had forfeited his interest. Thus, there was no express or implied waiver of petitioner's default by the partnership, since that forfeiture had already occurred. Moreover, petitioner never offered to pay the rest of his capital contribution. We therefore find that the forfeiture of petitioner's interest was not subsequently waived by his $ 4,111 payment to HUD. [21]
Having been unpersuaded by petitioner's arguments regarding the validity of the general partner's actions in effectuating the forfeiture of petitioner's partnership interest, we hold that petitioner forfeited his partnership interest effective January 1, 1977. Petitioner thus was not entitled to a distributive share of the partnership's net loss for 1977. [22]
*458 When petitioner forfeited his partnership interest as of January 1, 1977, he was also relieved of his share of the partnership's liabilities as of that date. The HUD mortgage here was nonrecourse, and neither the partnership nor the individual partners had any personal liability in regard thereto. Where none of the partners has any personal liability with respect to a liability, then all of the partners, including limited partners, will share in such liability in the same proportion as they share profits of the partnership. Sec. 1.752-1(e), Income Tax Regs. Thus, petitioner will share in this liability to the extent of his 23.5 percent share. Under section 752(b), this decrease in petitioner's share of the partnership's liabilities is considered a distribution of money to petitioner. A distribution of money to a partner in excess of the partner's adjusted basis in the partnership immediately before the distribution results in recognizable gain to the distributee partner. Sec. 731(a). This gain is considered as gain from the sale or exchange of the distributee partner's partnership interest. Sec. 731(a). Further, the gain is considered as being from the sale or exchange of *459 a capital asset. Sec. 741. [23] Petitioner's share of the partnership's liabilities on January 1, 1977 was $ 113,650, and his adjusted basis was $ 31,402. See n.12, supra. Accordingly, petitioner must recognize capital gain of $ 82,248 in 1977. [24]
*460 II. Unreported Income
The next issue for decision is whether petitioner had unreported income of $ 12,115.98, $ 4,200, and $ 5,803 in his taxable years 1977, 1978, and 1979, respectively. Respondent made a bank deposit analysis of petitioner's checking account with the Bank of the Commonwealth, and with the exception of $ 2,063 in 1979, the above amounts represent unexplained deposits to this account. The $ 2,063 represents the difference between the amount of reportable state income tax refunds petitioner received in 179, $ 3,168, and the amount petitioner actually reported, $ 1,105. Respondent determined that the $ 2,063 was additional taxable income to petitioner in 1979. The Commissioner's determination of a deficiency is presumed to be correct and the taxpayer has the burden of proving it incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). At trial and on brief, petitioner offered no substantive argument regarding this $ 2,063 omission. Thus, respondent's determination must be sustained. The balance of the unreported income determined by respondent relates to his use of the bank deposits method of income reconstruction. The use *461 of the bank deposits method has long been an accepted method of reconstructing a taxpayer's income. Nicholas v. Commissioner,70 T.C. 1057, 1064-1065 (1978); Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). [25] Use of the bank deposits method is proper even when the taxpayer keeps books and records which support his return as filed. Harper v. Commissioner,54 T.C. 1121, 1129 (1970); Campbell v. Guetersloh,287 F.2d 878 (5th Cir. 1961). The unreported income amounts determined by respondent are those bank deposits which petitioner failed to explain and provide documentation for. Petitioner argues that respondent's bank deposits analysis failed to consider several nontaxable sources. Specifically, petitioner contends that the unexplained deposits came from: (1) at least $ 7,000 cash on hand he had at January 1, 1977, and at least $ 3,000 cash on hand at January 1, 1979; (2) a $ 5,000 personal loan petitioner received in January 1977 from a Walter Harvey; (3) a $ 4,300 Federal income tax refund for 1976, received in 1977; (4) a $ 8,310 Federal income tax refund *462 for 1977 received in 1978; and (5) redeposits of previously withdrawn funds. Petitioner offered no books or records or other documentation or credible evidence to support these claimed nontaxable sources. For his claimed cash on hand petitioner offered only his own vague, generalized testimony and a copy of a personal financial statement dated January 21, 1977, submitted to the Bank of the Commonwealth. The financial statement, prepared by petitioner, lists his "Cash on Hand and in Bank" as $ 8,000. (Emphasis supplied.) Due to this heading, "Cash on Hand and in Bank," we cannot determine how much of the $ 8,000 petitioner had on hand, and how much of it was already in the bank. We certainly cannot conclude, as petitioner asks us to do, that less than $ 1,000 was in the bank and that he had the rest in cash. With regard to the $ 5,000 personal loan petitioner claims to have received and deposited in January 1977, there is no documentation or other probative evidence to support the existence of such a loan. Petitioner concedes the $ 4,300 income tax refund received in 1977 was not deposited *463 in total to his checking account, but he claims on brief to have cashed the check somewhere else, then deposited it, piecemeal, into his checking account. However, there is no probative evidence in the record to suggest this contention. With regard to the $ 8,310 income tax refund received in 1978, respondent's bank analysis shows that this $ 8,310 was deposited into petitioner's account on November 21, 1978. Thus, this amount provides no explanation as to any of the unexplained deposits, since this $ 8,310 was not considered as an unexplained deposit. Finally, for his claim on brief of redepositing previously withdrawn funds, petitioner argues that respondent failed to consider or adjust for checks petitioner had written to cash, followed by a redeposit of the cash. Again, there is no probative evidence to support this theory. Where a taxpayer has made numerous deposits in bank accounts, the source or nature of which are not accounted for or recorded in books or records maintained by him, determinations of income made by the Commissioner on the basis of such deposits have a presumption of correctness and the taxpayer has the burden of overcoming this presumption. Harper v. Commissioner,54 T.C. 1121, 1129 (1970). *464 [26] Based on the evidence in the record we find that petitioner has not met his burden of proof with regard to the unexplained bank deposits. Accordingly, respondent's determinations of unreported income must be sustained. *465 III. Charitable Contribution
The next issue for decision concerns a $ 500 charitable contribution deduction petitioner claimed in 1978 which respondent has disallowed. Petitioner has the burden of proving respondent's determination incorrect. Welch v. Helvering, supra.Specifically, with respect to deductions, taxpayers are required to maintain and present for examination books and records sufficient to establish their rights to the deductions claimed. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); sec. 6001. Petitioner did not produce any records or other documentation to substantiate his claimed charitable contributions, but he argues that he should be allowed the deduction based on his credible oral testimony. We would carefully consider such oral testimony if there was any in the record, but there is none. [27] When a taxpayer proves that some part of an expenditure was made for deductible purposes, and when the record contains sufficient evidence for us to make a reasonable allocation, we will do so. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). However, the record in this case provides no reasonable *466 basis for making such an allocation. See n.27, supra. Thus, respondent's disallowance of the claimed deduction is sustained. IV. Dependency Exemption
The next issue for decision is whether petitioner was entitled to a dependency exemption for his minor son in 1977, 1978, and 1979. Petitioner was divorced from his ex-wife, Jerlyn, in 1974, with Jerlyn receiving custody of their minor son, Samuel E. Gardner II. Section 151(e) provides generally that a taxpayer is allowed a dependency exemption ($ 750 for 1977 and 1978, $ 1,000 for 1979) for each minor child who is a dependent of the taxpayer. A taxpayer's minor son is a dependent of the taxpayer if the taxpayer provides over half of the son's support. Sec. 152(a). Generally, in case of divorced parents, the parent having custody of the child *467 for a greater portion of the calendar year is treated as providing over half of the child's support. Sec. 152(e)(1). However, under section 152(e)(2)(B), the noncustodial parent is treated as providing over half of his child's support if: (1) the noncustodial parent provides $ 1,200 or more for the support of such child for the calendar year, and (2) the custodial parent does not clearly establish that she provided more for the support of such child than the noncustodial parent. McGuire v. Commissioner,77 T.C. 765, 769-770 (1981). And where, as here, the custodial parent is not before the Court and the noncustodial parent establishes the requisite amount for the support of the child, the burden is upon respondent to clearly establish that the custodial parent furnished more support for the child than the noncustodial parent did. Labay v. Commissioner,55 T.C. 6, 11, 13 (1970), affd. per curiam 450 F.2d 280 (5th Cir. 1971). Respondent has not carried his burden of proof. The record establishes that petitioner, the noncustodial parent, provided well in excess of $ 1,200 for the support of his minor son in each of the years 1977, 1978, *468 and 1979. Thus, petitioner is entitled to the benefit of the presumption of section 152(e)(2)(B). Respondent provided no evidence to rebut the presumption. Further, petitioner's ex-wife Jerlyn, the custodial parent, executed Multiple Support Declarations (Forms 2120) for each of the three years in issue. In these declarations, Jerlyn stated that she did not provide more than half of her son's support during any of the three years, that she understood that her son was being claimed as a dependent by petitioner during these years, and that she agreed not to claim her son as a dependent on her income tax returns for any of these years. Even though these declarations were not executed by Jerlyn until May 7, 1984, we find that they are least consistent with the evidence of record and make it more likely than not that Jerlyn did not provide more support for the son than petitioner did. [28] Even if we disregarded the declarations, as respondent asks us to do, respondent would still fail to carry the burden of proof. Therefore, we find that petitioner has met the test described in section 152(e)(2)(B), and thus is treated as having provided more than half of his son's support. Accordingly, *469 under sections 152(a) and 151(e) petitioner was entitled to a dependency exemption for her son in 1977, 1978, and 1979. V. Additions to Tax
Finally, we consider the additions to the tax. In his answer, respondent asserted an addition to the tax for 1977 under section 6651(a) due to petitioner's failure to file a timely return. The amount of the addition asserted was 25 percent of the amount required to be shown as tax on petitioner's 1977 return. Since this issue was first raised by respondent in his answer, respondent has the burden of proof. Rule 142(a). To meet this burden, respondent must show only that petitioner's return for 1977 was filed late, but also that the late filing was due to "willful neglect" and not due to "reasonable cause," within the meaning of section 6651(a). Bruner Woolen Co. v. Commissioner,6 B.T.A. 881, 882 (1927). [29]
*470 The record establishes that petitioner's 1977 return was filed six months after its due date, and that petitioner neither requested nor was granted an extension of time. Based on the evidence in the record, however, we find that respondent has failed in his burden of showing that the late filing was due to willful neglect and not due to reasonable cause. If the burden of proof had been upon petitioner to show that his failure to file on time was "due to reasonable cause and not due to willful neglect," his explanation for failing to file on time might well not be sufficient to relieve him of the 25-percent addition to the tax. See United States v. Boyle,469 U.S. 241 (1985). However, since the burden is upon respondent, and since we think respondent has failed in his burden, we hold that no addition to the tax under section 6651(a) should be imposed. Respondent also determined that for the years 1978 and 1979, petitioner is liable for the section 6653(a) addition to the tax for negligence or intentional disregard of rules and regulations. Here, however, petitioner bears the burden of proof. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); *471 Rule 142(a). With regard to 1978, petitioner took a 500 charitable deduction although he had no records, receipts, or other documentation to support the deduction. Even a cash contribution must be substantiated, if only by testimony sufficient to satisfy the find of fact that a contribution has in fact been made. Thus, petitioner failed to keep adequate records to substantiate his deduction as required by section 1.6001-1(a), Income Tax Regs. See Gilman v. Commissioner,72 T.C. 730, 751 (1979); Axelrod v. Commissioner,56 T.C. 248, 258-259 (1971). Also, in regard to the unreported income, his financial records were insufficient to explain the bank deposits. We think this failure to keep adequate records was due to negligence. In 1979, petitioner reported $ 1,105 gross income from state income tax refunds when in fact he received at least $ 3,168 in reportable state income tax refunds. Petitioner received two state income tax refunds in 1979 totaling $ 3,168, one from his 1977 state income tax return and one from his state 1978 income tax return. Petitioner claims to have reported the 1978 refund, but not the 1977 refund even though the 1978 *472 refund was $ 1,180 and petitioner only reported $ 1,105. Petitioner argues that since he reported the 1978 refund on his 1979 return, it should appear eminently clear that his failure to report the 1977 refund received in 1979 was due to his unfamiliarity with the reporting requirements. We fail to see the logic in that argument. We think petitioner's failure to report $ 2,063 out of $ 3,168 taxable state income tax refunds he received was due to negligence. And again we are troubled by the lack of financial records to document the unexplained bank deposits. Based on the evidence in the record, we find that petitioner has failed to meet his burden of proof with respect to the section 6653(a) additions to the tax. Thus, respondent's determination of these additions must be sustained. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. In a statutory notice of deficiency issued May 28, 1982, respondent determined an addition to tax under section 6653(b) for the year 1977 in the amount of $ 24,644.50. In his answer, respondent conceded the section 6653(b) addition for 1977 and asserted an addition to the tax for that year under section 6651(a) in the amount of 25 percent of the amount required to be shown as tax on petitioner's 1977 return. ↩
3. Petitioner's overall burden of proof argument warrants no response. After extensive pretrial discovery and a three-day trial on the merits, the resolution of the issues in this case does not depend upon burden of proof, except in the instances otherwise specifically noted in the Opinion below. In addition, respondent, perhaps out of an excess of caution, discussed two issues which petitioner passed over in silence. Respondent's opening brief discusses a statute of limitations issue for 1977; petitioner's opening brief did not raise the issue and his reply brief did not respond thereto. In any event, the record clearly establishes that the statute of limitations was suspended during the summons enforcement proceedings (sec. 7609(e)), and the statutory notice of deficiency for 1977 was timely issued. In an amended 1979 return, petitioner claimed an exclusion from income of $ 1,029, apparently relating to a deferred compensation plan for state judges. This amended return was filed after the petition was filed herein and petitioner never sought to assert that claim in this proceeding, and we deem the matter conceded by petitioner. In any event, as respondent points out, there is no evidence in the record in regard to the item and it was not involved in the deficiency determination that the Court has been asked to redetermine. ↩
4. As filed with the Court, the first stipulation of facts contains paragraphs 1 through 49 and the third stipulation of facts contains paragraphs 50 through 107. No second stipulation of facts was executed by the parties and filed with the Court. ↩
5. The partnership agreement in effect on October 17, 1974 was amended on that date to change the name of the partnership from Boulevard East Apartments to Boulevard East Apartments Limited Dividend Housing Association. All further references will be to the "partnership," whether before or after the name change. ↩
6. Petitioner seemed to know little about his Boulevard East investment, and he had no personal knowledge as to the operations of the partnership business. He apparently relied almost entirely upon his attorneys, Frederick A. Patmon and Hallison H. Young, to handle this matter. Petitioner testified, and we believed him, that he paid the $ 12,500 to his attorneys and that the money was never returned to him; he admitted, however, that he was aware that his attorneys had not paid the money to the partnership. ↩
7. On February 25, 1977, petitioner's attorneys sent their trust account check No. 1004T, in the amount of $ 4,111.09, directly to HUD on behalf of petitioner. The payment was applied against the partnership's mortgage. The mortgage had been delinquent and HUD was considering foreclosure on the property. This payment brought the mortgage current. In his calculation of petitioner's adjusted basis of his partnership interest as of January 1, 1977, respondent initially failed to include, but now has properly included, this direct payment to HUD made on February 25, 1977. See n. 12, infra.↩
8. Strong and Barney each made a payment of $ 4,416 to the partnership, Strong in December 1977, and Barney in January 1978, as part payment for their increased partnership interests. While classified as loans on the partnership's financial statements for 1978, no notes were ever executed and none of the amounts were ever repaid to Strong and Barney. Strong and Barney each made an additional payment to the partnership in 1979 in the amount of $ 4,500. By December 31, 1979, Strong and Barney had paid into the partnership the total amounts that petitioner and Del Rio had defaulted on. These subsequent additional capital contributions and any loans from the remaining limited partners are not relevant to any issues before the Court. We note that the remaining limited partner made these payments to keep the partnership going and to defer the realization of capital gain income that they understood would occur upon foreclosure of the mortgage. The mortgage was ultimately foreclosed in 1983. ↩
9. Patmon wrote that letter after petitioner had already filed his 1977 tax return. As will be discussed below, petitioner's 1977 Form 1040 was based on an amended partnership return that his attorney had already caused to be prepared and which petitioner had signed as a limited partner but had not yet filed with the Internal Revenue Service. ↩
10. We note that an amended partnership return for 1978 was also prepared by Glass and signed by petitioner as a limited partner. The record does not show exactly when that 1978 amended partnership return was prepared, but apparently it was sometime in 1979. The 1978 amended partnership return was filed with the Internal Revenue Service in early 1980. Petitioner, however, did not claim a partnership loss deduction on his 1978 Form 1040, which was filed on October 16, 1979, and never filed an amended Form 1040 to assert such a claim. No issue in regard to a Boulevard East partnership loss is raised in the statutory notice of deficiency for 1978 and 1979. ↩
11. At trial and on brief, petitioner complains that respondent did not audit either the original partnership return filed by the general partner or the amended partnership return filed by the general partner or the amended partnership return later filed by petitioner. However, there is no dispute as to the amount of partnership loss shown on the partnership return, particularly since the partnership loss reflected on the amended partnership return filed by petitioner was somewhat lower than the loss reported by the general partner. The only issue is whether petitioner is entitled to deduct an allocable portion of that loss. ↩
12. In the notice of deficiency, respondent determined that petitioner's long-term capital gain was $ 113,058. However, respondent's computation failed to take into account petitioner's adjusted basis in his partnership interest. On brief, respondent realized this error and recalculated petitioner's gain. The proper calculation of petitioner's long-term capital gain is as follows: Taxpayer's Adjusted Basis
For His Partnership Interest
Initial contribution
$ 12,500 1977 payment to HUD
4,111 23.5 percent of partnership
liabilities as of 1/1/77 (HUD  mortgage balance of $ 483,618)  113,650 $ 130,261 Less: Partnership losses
claimed on petitioner's
1973, 1974, 1975, and 1976
returns
(98,958)
Adjusted Basis
$ 31,402 Computation of Capital Gain
Amount realized - 23.5 percent
of liabilities $ 113,650 Less: Adjusted basis
(31,402)
Capital Gain
$ 82,248 Less: section 1202 deduction (50%)
(41,124)↩
Taxable Gain
$ 41,124 13. "Excess itemized deductions" is the term used in Schedule A to the Form 1040 to represent the excess of itemized deductions over the zero bracket amount (formerly the standard deduction) that is already taken into account in the rate structure. ↩
14. It is not entirely clear as to which individual or individuals petitioner relied upon to file such a request. His return preparer at that time was James B. Feaster, who at one time was a member of the law firm including petitioner's present counsel, Frederick A. Patmon and Hallison H. Young. ↩
15. The Michigan Revised Uniform Limited Partnership Act, sections 20.1101 through 20.2108 of the Mich. Stat. Ann., was enacted in 1982 with an effective date under section 20.2108 of January 1, 1983. ↩
16. This case is also captioned as Wayne County Prosecutor v. Recorder's Court Judge.↩
17. A variant of this notice argument is petitioner's theme at trial and on brief that he never consented or agreed to the forfeiture of his partnership interest and that the general partner never instituted any civil proceeding against him to terminate his partnership interest. We think section 4.10 of the partnership agreement does not require his consent or agreement of the institution of a lawsuit. Petitioner was clearly in default on his capital contribution. It would be strange if the party breaching a contract had to consent or agree to the other party's treating the contract as breached. Petitioner argues that he was not in default, that due to the alleged mismanagement by the general partner he was entitled to withhold his capital contribution. The factual predicate for this contention is not established by the record; the record merely contains petitioner's hearsay testimony that his counsel told him they were dissatisfied with the management of the partnership. See n.6, supra.↩ The record does not establish any partnership management problems other than those problems caused by the two limited partners' withholding the balance of their capital contributions. It is true that Williams himself was not entirely happy with the HUD-selected management firm, but there is no indication that Williams was not performing properly as the general partner. Thus, we are satisfied that if anyone breached the partnership agreement, it was petitioner. Section 4.10 of the partnership agreement spelled out the consequences of such a default ("shall forfeit his percentage interest in the Partnership capital, profits, and losses"). We think this provision was designed to be automatic upon default rather than requiring the general partner to institute civil proceedings against petitioner. Accordingly, we think petitioner's arguments are without merit. 18. Section 20.75, Michigan Statutes Annotated, requires the amendment to be filed in the offices of the county clerk where the certificate (partnership agreement) is recorded. ↩
19. We think most of petitioner's arguments about how or when the remaining limited partners made their additional capital contributions and loans to the partnership and their status before petitioner's forfeiture are irrelevant to any issues before the Court. See n.8, supra. Section 4.10 of the partnership agreement provided that "the remaining Limited Partners, if any, may acquire,↩ pro rata, Limited Partnership interests of such Defaulting Partner * * *" but it did not require it. Section 4.10 also permitted the general partner "to effectuate the contraction and reduction of said Defaulting Limited Parrtner's interests" to additional limited partners. The provision also permitted the remaining limited partners to bring in a substitute limited partner. In any event, the other limited partners are not before the Court and we are not deciding the propriety of any partnership loss deductions they may have taken on their tax returns in 1977 or thereafter. 20. New Mexico's Uniform Limited Partnership Act, sections 54-2-1 through 54-2-30 of the New Mexico Statutes Annotated↩ (1978), is substantially similar to Michigan's Limited Partnership statutes. 21. Respondent did, however, give petitioner the benefit of the $ 4,111 payment in the computation of petitioner's adjusted basis for his partnership interest. See n.12, supra.↩
22. On brief, petitioner argues that even assuming a forfeiture of his partnership occurred as contended, he is still entitled to his distributive share of the partnership's net loss for 1977 on the theory that there cannot be any retroactive allocation of losses among partners in a partnership. However, since we find that petitioner forfeited his interest as of January 1, 1977, the issue of retroactive allocation for 1977 is moot. We note that petitioner entered the partnership on December 27, 1973, and claimed a partnership loss of $ 24,837 for that year. Petitioner seemed to make an argument that since he had paid part of his capital contribution, his entire partnership interest should not be forfeited. To the extent that this is intended to be a legal argument, we note that the partnership agreement, section 4.10, provides otherwise. To the extent this is some type of equitable plea, we note that up to December 31, 1976, petitioner had already claimed and been allowed partnership losses of $ 98,959 on his $ 12,500 investment. ↩
23. Section 751, relating to unrealized receivables and inventory items which have appreciated substantially in value, does not apply in this case. ↩
24. Petitioner argues that the partnership was insolvent before and after January 1, 1977. There is no competent evidence in the record that the partnership was insolvent, but arguments about the fair market value of the partnership's assets are irrelevant in any event. Petitioner seems to ignore the effect of Crane v. Commissioner,331 U.S. 1 (1947) and Commissioner v. Tufts,461 U.S. 300 (1983) in regard to nonrecourse liability in computing the basis of property upon a sale or exchange. Also petitioner seems to be arguing the insolvency exception to the general rule of income from discharge of indebtedness. United States v. Kirby Lumber Co.,284 U.S. 1↩ (1931); sec. 108. However, the insolvency exception pertains to the taxpayer's insolvency, and there certainly is no suggestion that petitioner was insolvent.
25. See also Ripley v. Commissioner,T.C. Memo. 1987-114↩. 26. See also Marcello v. Commissioner,380 F.2d 494 (5th Cir. 1967), affg. on this issue a Memorandum Opinion of this Court; O'Dwyer v. Commissioner,266 F.2d 575, 588 (4th Cir. 1959), affg. 28 T.C. 698 (1975), cert. denied 361 U.S. 862 (1959); Doll v. Glenn,231 F.2d 186, 188 (6th Cir. 1956); Boyett v. Commissioner,204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court; Goe v. Commissioner,198 F.2d 851, 853 (3d Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 344 U.S. 897 (1952); Hoefle v. Commissioner,114 F.2d 713, 714 (6th Cir. 1940), affg. 37 B.T.A. 1334 (1938); Jones v. Commissioner,29 T.C. 601, 613-614 (1957); Estate of Hague v. Commissioner,45 B.T.A. 104, 109, affd. 132 F.2d 775, 776 (2d Cir. 1943), cert. denied 318 U.S. 787↩ (1943).
27. Petitioner's total testimony on the charitable contributions deduction issue, which is the only evidence in the record supporting his argument, was as follows: Q. Have you ever made any charitable contributions in cash? A. Sure.
This is simply inadequate to support a finding that he made a cash contribution in 1978 in the amount of $ 500 or any other amount.↩
28. We read these declarations as representations by Jerlyn that she did not in fact claim her son as a dependent during those years. If that were not the fact, respondent should have been able to show otherwise.↩
29. See also L. W. Pickett v. Commissioner,T.C. Memo. 1975-33; Lilly Harris v. Commissioner,T.C. Memo. 1969-49; Wayne Coal Mining Company v. Commissioner, a Memorandum Opinion of this Court dated March 31, 1953, affd. without discussion of this point 209 F.2d 152↩ (3d Cir. 1954).