## THOMAS O'MALLEY AND RITA O'MALLEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28404-86.     Filed August 25, 1988.

*Edward J. Calihan, Jr.,* and *Patrick J. Calihan,* for the petitioners.

*William E. Bogner* and *Madlyn B. Coyne,* for the respondent.

RUWE, *Judge:* Respondent determined deficiencies in petitioners' 1981 and 1982 Federal income taxes in the amounts of $174,428.31 and $109,796.67, respectively. The issues for decision are: (1) Whether petitioner, Thomas O'Malley, received unreported income in the amounts of $266,280.55 and $212,212.34 for the taxable years 1981 and 1982, respectively, from the payment by Central States Pension Fund of his legal fees; (2) whether petitioner, Thomas O'Malley, may deduct, under sections 162(a)[1] or 212(1), the legal expenses he incurred in connection with his unsuccessful defense in a criminal proceeding; and (3) whether petitioner, Rita O'Malley, is relieved of liability as an innocent spouse under section 6013(e).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits attached are incorporated herein by this reference.

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and as in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioners resided in Mount Prospect, Illinois, when they filed their petition in this case.

## Legal Fees

During the years 1978 through 1982, petitioner Thomas O'Malley (hereinafter referred to as Mr. O'Malley) was the director of industrial relations at C.W. Transport Co. (C.W.). C.W., a common carrier trucking company with headquarters in Central Wisconsin, transported goods within the Midwest and Southeast region.

As director of industrial relations, Mr. O'Malley was in charge of labor relations for C.W.'s entire system. He adjudicated at grievance hearings and negotiated all labor contracts on behalf of C.W., primarily with the International Brotherhood of Teamsters (Teamsters).

In 1977, 1980, and 1983, Mr. O'Malley was on the negotiating committee of the National Master Freight Agreement. This agreement was a master contract which controlled the working conditions, salaries, and wages of all Teamsters' members employed with trucking lines in the United States.

From 1978 until December 20, 1982, Mr. O'Malley also served as an employer trustee of the Central States, Southeast and Southwest Areas Health and Welfare Fund, and the Central States, Southeast and Southwest Areas Pension Fund (pension fund). The pension fund was a trust fund established to provide retirement and related benefits to members of the Teamsters and was managed by a board comprised of employer and employee trustees.

The pension fund was a multiemployer plan. Companies doing business anywhere in the Central States, Southeast, or Southwest areas, contributed to the pension fund on behalf of their employees who were members of the Teamsters. Employer contributions were pooled rather than segregated into separate accounts. During the time Mr. O'Malley served as trustee, C.W. contributed to the pension fund on behalf of approximately 1,800 covered employees.

A Federal statute[2] prohibits trustees of pension funds from receiving a salary or compensation from the pension

---

[2] 29 U.S.C. sec. 1108(c)(2) (1982).

fund when they are employed by an employee or employer group that contributes to the fund. As a full-time employee of C.W., Mr. O'Malley received no monetary compensation from the pension fund but the pension fund provided him with insurance coverage and other minor benefits.

As a trustee of the pension fund, Mr. O'Malley formed contacts with members of the Teamsters, which he used in his position as grievance adjudicator for C.W. When he became a trustee, Mr. O'Malley received an increase in salary from C.W. and at a later time was considered for a vice presidential position with C.W.

On May 22, 1981, Mr. O'Malley and four other individuals were indicted in the U.S. District Court for the Northern District of Illinois.[3] Count I of the indictment charged the defendants with conspiracy to bribe a U.S. Senator in violation of 18 U.S.C. section 371. Count II charged the defendants with causing Thomas O'Malley, a trustee, and Amos Massa, a former trustee, to travel in interstate commerce to California, with the intent to promote the bribery, in violation of 18 U.S.C. section 1952 (1982). Counts III to XI charged the defendants with using interstate wires for the purpose of executing a scheme to defraud the pension fund of its "right to conscientious, loyal, faithful, disinterested, and unbiased services of THOMAS F. O'MALLEY and ANDREW G. MASSA, in the performance of acts related to their official duties, functions, and employment," in violation of 18 U.S.C. section 1343.

On or about December 16, 1982, after a 10-week jury trial, Mr. O'Malley was convicted on all counts of the indictment and sentenced to a prison term of 30 months. Mr. O'Malley filed a notice of appeal with the Court of Appeals for the Seventh Circuit and his conviction was affirmed on June 8, 1984.[4] As a result of Mr. O'Malley's conviction, he was prohibited from working in labor relations for 13 years.

---

[3]The case was captioned, *United States v. Allen M. Dorfman, Roy L. Williams, Joseph Lombardo, Thomas F. O'Malley, and Andrew G. Massa, also known as Amos Massa,* 550 F. Supp. 877 (N.D. Ill. 1982).

[4]*United States v. Williams,* 737 F.2d 594 (7th Cir. 1984).

The facts upon which the indictment and conviction were based are summarized as follows.[5] In 1972, the pension fund acquired a 5.8 acre plot of land in Las Vegas, Nevada, known as the Wonderworld property. In 1977, the pension fund relinquished managerial control of the Wonderworld property to the Victor Palmieri Co. (Palmieri).

Palmieri decided to sell the Wonderworld property in 1978. At that time, homeowners surrounding the Wonderworld property organized out of concern that a high-rise building would be constructed on the property. They selected Senator Howard Cannon, who lived across from the Wonderworld property as their spokesman.

Senator Cannon was then the chairman of a Senate committee considering legislation to deregulate the trucking industry. Prior to 1980, the Federal Government, through the Interstate Commerce Commission (ICC), controlled entry into the trucking industry by regulating truck routes. The operating authority for a specific truck route which the ICC granted to a trucking company was a valuable asset. Many members of the trucking industry, including C.W., actively opposed deregulation fearing that it would render their ICC operating authority worthless and bring increased competition which would threaten their businesses. Deregulation also posed a potential threat to the pension fund. It was anticipated that deregulation would force certain existing companies out of business, resulting in a decline in the number of employers contributing to the fund. It was also anticipated that trucking businesses formed after deregulation would be less likely to hire union employees and therefore would not be contributors. As a result, the remaining employer-contributors would bear an increased financial burden to support the pension fund.

In January 1979, the homeowner's group submitted a bid of $1,400,000 on the Wonderworld property to Palmieri. At that time, Allen Glick, an investor, submitted a bid of $1,600,000 on the Wonderworld property. Mr. O'Malley and others who were connected with the Teamsters and the pension fund, sought to influence Senator Cannon's actions

---

[5]In briefing this case, both parties have relied upon the recitation of facts in *United States v. Williams, supra.* For purposes of deciding the instant case, the evidence presented at trial is consistent with the facts recited in *United States v. Williams, supra.*

and decisions on deregulation legislation by facilitating the Cannon group's purchase of the Wonderworld property at a price of $1,400,000.

A plan was formulated whereby Mr. O'Malley flew to California with Andrew Massa, another codefendant and former trustee of the pension fund, to encourage Mr. Glick to withdraw his offer. Mr. Glick withdrew his offer after Mr. O'Malley informed him that Senator Cannon and his homeowner's group had submitted an opposing bid and that Senator Cannon chaired a Senate committee considering legislation harmful to the trucking industry.

C.W. did not direct Mr. O'Malley to travel to California to see Mr. Glick, and Mr. O'Malley did not report to anyone at C.W. upon his return from California.

Prior to the criminal trial, Andrew J. Decker and Execon, Inc., executive consultants, assisted in the preparation and presentation of Mr. O'Malley's defense to the charges in the indictment. Prior to, and during the criminal proceedings and on appeal, the law firm of Hundley & Cacheris, P.C., represented Mr. O'Malley. The total fees for the services provided for Mr. O'Malley by Hundley & Cacheris, P.C., Andrew J. Decker, and Execon, Inc., were $266,280.55 in 1981, and $212,212.34 in 1982.

The pension fund's litigation defense costs policy was originally adopted by resolution at a meeting of the board of trustees of the pension fund (board) on February 15, 1978. This litigation defense costs policy was based upon the following provision of the trust agreement of the pension fund:

*Sec. 6. Expenses*—All proper and necessary expenses incurred by any former or incumbent Trustee, including costs of defense in litigation arising out of the Trusteeship of this Fund, and also including costs incurred by any former or incumbent Trustee in providing testimony or information about administration of this Fund in any investigation, trial or other proceeding, shall be paid out of the Trust Fund, as a matter of right of any such former or incumbent Trustee, to the extent permitted by applicable law. As used in the preceding sentence, the term "costs" includes but is not limited to reasonable attorneys' fees.

Under the litigation defense costs policy adopted at this meeting on February 15, 1978, the pension fund would pay costs of defense, including reasonable attorneys' fees, on

behalf of present or former trustees, officers, or employees of the pension Fund. The policy coverage applied only to costs of defense in civil litigation involving alleged acts or omissions during the course of service of the trustee, officer, or employee. Policy coverage was limited, as follows:

(b) No Policy Coverage shall be extended in defense of an allegedly dishonest act or an allegedly fraudulent and intentional act if the Covered Person has admitted his culpability or if the Trustees determine, upon review of evidence and information presented to them, that the Covered Person will probably be adjudged to have been a knowing participant in the alleged dishonesty or fraud.

As a condition of the policy coverage, the pension fund was to be subrogated to the right of recovery of the covered trustee, officer, or employee against any person or entity for the amounts the pension fund paid on his behalf.

On June 2, 1981, the law firm of Coghlan, Joyce & Nellis provided the pension fund with a legal opinion which reviewed the facts relating to Mr. O'Malley's indictment, and concluded that Mr. O'Malley was entitled to indemnification by the pension fund for reasonable costs of defense incurred in connection with the criminal prosecution. The legal opinion recommended that Mr. O'Malley be indemnified currently rather than upon the outcome of the trial.

At a meeting held on June 4 through 6, 1981, the board authorized the current and future indemnification of reasonable defense costs, including reasonable attorneys' fees which Mr. O'Malley incurred before and during trial.

At its meeting on October 20 through 21, 1981, the board adopted a new litigation defense cost policy for the pension fund, effective retroactively. This new defense cost policy was substantially identical to the prior policy except that it covered both civil and criminal litigation defense costs.

At a meeting on August 17 through 18, 1982, the board resolved that the pension fund would not pay any additional attorneys' fees and other defense costs in the criminal case on behalf of any trustees of the pension fund, without specific authorization by the board after written notice had been given to the Department of Labor. The pension fund made no additional payments for Mr. O'Malley's defense costs after the August 17 through 18, 1982, meeting of the board.

The pension fund subsequently was reimbursed for the litigation expenses paid on behalf of Mr. O'Malley by two insurance companies, National Union Fire Insurance Co. of Pittsburgh, Pennsylvania, and Midland Insurance Co. C.W. was not requested to, nor did it make any payment of any portion of Mr. O'Malley's legal fees.

Petitioners did not report the amounts which the pension fund paid in legal fees on behalf of Mr. O'Malley on their income tax returns for 1981 and 1982. In the deficiency notice for 1981 and 1982, respondent increased petitioners' reported income by the amount of the legal fees which the pension fund paid for him.

## Innocent Spouse

During 1981 and 1982, petitioner Rita O'Malley (hereinafter referred to as Mrs. O'Malley) was a receptionist for the Central Conference of Teamsters. Mrs. O'Malley filed joint returns with her husband for the years 1981 and 1982. A professional return preparer prepared petitioners' returns for these years which both petitioners signed.

Mrs. O'Malley knew that her husband was involved in a criminal trial during 1981 and 1982. She met her husband's attorney and knew that he represented Mr. O'Malley during the entire criminal proceeding. Mrs. O'Malley also knew that the pension fund was paying her husband's legal expenses.

### OPINION

### Legal Fees—Inclusion in Income

Section 61(a) defines gross income as "all income from whatever source derived." In enacting section 61 and its predecessors, Congress intended to use the full measure of its taxing power "to tax all gains except those specifically exempted." *James v. United States,* 366 U.S. 213, 219 (1961).

It is well established that a third person's payment of an obligation of the taxpayer, is equivalent to the receipt of the amount of the obligation by the taxpayer. *Old Colony Trust Co. v. Commissioner,* 279 U.S. 716, 729 (1929).

Petitioners do not contend that the amounts which the pension fund expended in legal fees on Mr. O'Malley's behalf constitute a gift or are otherwise specifically exempted from gross income. Petitioners' position is that the legal expenses which arose from the unsuccessful defense of Mr. O'Malley in the criminal case were actually the expenses of the pension fund. Petitioners assert that they should not be taxed on the incidental benefit they received from the pension fund's payment of its own expense.

We do not agree that Mr. O'Malley's legal fees were primarily the expense of the pension fund, nor do we agree that petitioners received only an incidental benefit from the pension fund's payment of these legal fees. The pension fund was not a defendant in the criminal proceeding in which Mr. O'Malley was indicted. See *Matula v. Commissioner*, 40 T.C. 914, 920 (1963); *Sachs v. Commissioner*, 32 T.C. 815, 820 (1959), affd. 277 F.2d 879 (8th Cir. 1960). Further, the pension fund was not directly affected by the outcome of the criminal proceeding except to the extent that the proceeding determined whether Mr. O'Malley continued to serve as its trustee. Although the criminal indictment described Mr. O'Malley as "an Employer Trustee of the Teamsters' Pension Fund," it named him individually as a defendant and Mr. O'Malley personally served a prison term.

This case is similar to *Matula v. Commissioner, supra.* In *Matula*, the taxpayer was the secretary-treasurer of the local labor union. He was convicted of committing perjury before a legislative committee. The local union was not a party to the criminal proceeding but paid the taxpayer's legal fees. The Court determined that the amount of legal fees paid by the local union constituted taxable income to the taxpayer. This Court has reached the same result in cases involving payment by a third party of civil or criminal penalties imposed on the taxpayer. See *Huff v. Commissioner*, 80 T.C. 804 (1983); *Sachs v. Commissioner, supra.*

Petitioners assert that *Matula v. Commissioner, supra,* and *Sachs v. Commissioner, supra,* are distinguishable because in each case, the taxpayer was indicted for acts which he committed on his own behalf rather than on behalf of the entity which paid the legal expenses. Petitioners

maintain that the pension fund directed Mr. O'Malley to engage in the acts which led to his indictment and that the pension fund paid Mr. O'Malley's legal fees because it determined that Mr. O'Malley was indicted for acts which related to pension fund business. Petitioners also contend that the two insurance companies which reimbursed the pension fund for these legal expenses made the same determination.

We note, first, that the record is not clear as to whether officials of the pension fund knew of or directed Mr. O'Malley's criminal activity. Second, although the pension fund paid Mr. O'Malley's legal fees, it did so before all the facts relating to Mr. O'Malley's alleged criminal activities were available. Further, prior to the conclusion of Mr. O'Malley's trial, the pension fund voted to terminate the payment of his legal expenses. Third, the two insurance companies which reimbursed the pension fund for litigation costs paid on behalf of Mr. O'Malley, did so in connection with a settlement of claims by the Department of Labor against certain trustees of the pension fund for disbursement of pension fund property. There is no indication that these insurance companies made any finding that the pension fund properly paid these litigation costs.

Even if we were to accept petitioners' position, we nevertheless would find *Matula* applicable. The Court in *Matula v. Commissioner, supra* at 920, specifically noted that:

Even if the local had ratified petitioner's perjury with full knowledge of the facts and circumstances, it would have incurred no criminal responsibility, been subject to no fine or other penalty. It was not in any way a party to the criminal prosecution of Matula for perjury. Therefore, even with ratification, which we have found did not occur, the criminal proceeding remained personal to the petitioner.

Petitioners have cited no cases for their position that these legal fees are excludable from their gross income. The cases we found which have allowed a taxpayer to exclude from gross income the legal fees paid on his behalf by a third party do not support an exclusion in this case.

In *Parker v. Commissioner,* 365 F.2d 792 (8th Cir. 1966), affg. in part and revg. in part a Memorandum Opinion of this Court, the Eight Circuit determined that the taxpayer

was not required to include in gross income payments by an unincorporated religious association for the costs of defending criminal charges arising out of the taxpayer's activities as leader of that association. The court determined that it could not separate the acts of the taxpayer from the association. The court noted that the taxpayer had founded the association and was the guiding force behind it, and that the association could not continue in existence if the taxpayer were found guilty. Because of the complete identity between the association and the taxpayer, the court found that legal expenses were the expenses of the association. *Parker v. Commissioner, supra* at 801. In this case, there is no such identity between Mr. O'Malley and the pension fund.

In *Ingalls v. Patterson,* 158 F. Supp. 627, 642 (N.D. Ala. 1958), the court determined that a shareholder did not receive taxable income when the corporation reimbursed him for the legal fees which he paid in a shareholder derivative action brought for the benefit of the corporation. The court reasoned that the legal fees were an expense of the corporation because under Alabama law, the corporation was legally obligated to pay these legal fees. In this case, the pension fund was not required by law to pay Mr. O'Malley's legal fees.

The legal expenses arising from Mr. O'Malley's criminal indictment were Mr. O'Malley's expenses rather than the expenses of the pension fund. Accordingly, petitioners received taxable income in the amount of the legal fees which the pension fund paid on Mr. O'Malley's behalf.

### Legal Fees—Deduction

Petitioners take the position that even if the legal fees which the pension fund paid for Mr. O'Malley are includable in their gross income, they may deduct these legal fees as an ordinary and necessary expense incurred in a trade or business under section 162, or for the production of income under section 212.

Litigation expenses are deductible if the suit against the taxpayer "arises in connection with" or "proximately results from" the taxpayer's business or profit-seeking activity. *United States v. Gilmore,* 372 U.S. 39, 48 (1963);

*Kornhauser v. United States,* 276 U.S. 145, 153 (1928). As stated by the Supreme Court in *United States v. Gilmore, supra* at 44:

For income tax purposes Congress has seen fit to regard an individual as having two personalities: "one is [as] a seeker after profit who can deduct the expenses incurred in that search; the other is [as] a creature satisfying his needs as a human and those of his family but who cannot deduct such consumption and related expenditures."

In determining whether an expense is "business" or "personal" we must focus on "the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer." *United States v. Gilmore, supra* at 49. Although the Supreme Court in *Gilmore* considered the deductibility of legal expenses under section 212 and its 1939 predecessor, the reasoning of the Court is equally applicable to section 162. *Nadiak v. Commissioner,* 356 F.2d 911, 912 (2d Cir. 1966), affg. a Memorandum Opinion of this Court; *Kurkjian v. Commissioner,* 65 T.C. 862, 868 (1976).

Respondent's position is that the criminal proceeding out of which the legal expenses arose related exclusively to Mr. O'Malley's pension fund activities and not to his employment with C.W. Respondent reasons that because Mr. O'Malley was not a paid employee of the pension fund, his legal expenses arose in connection with a personal rather than profit-seeking activity. Petitioners reply that respondent's position does not consider the totality of the circumstances. We agree with petitioners.

Mr. O'Malley's trusteeship with the pension fund and his employment with C.W. clearly were interrelated activities. As an employee of C.W., Mr. O'Malley was an executive in the trucking industry working in the area of labor relations. In this capacity, he dealt frequently with officials of the Teamsters and C.W. employees who were members of the Teamsters. The pension fund, on which Mr. O'Malley served as trustee, was established to provide retirement and related benefits to members of the Teamsters. C.W. contributed to the pension fund on behalf of its covered employees. When Mr. O'Malley became a trustee, he received a salary increase from C.W., was considered for a promotion, and formed contacts beneficial to his employment with C.W.

Our finding of a direct relationship between Mr. O'Malley's trusteeship and his employment with C.W. is supported by 29 U.S.C. sec. 1108(c)(2) and its legislative history. Under 29 U.S.C. sec. 1108(c)(2), a trustee may not receive compensation from a pension plan if he also receives full-time pay from an employer whose employees are covered by the plan. The legislative history of section 1108(c)(2), indicates that this provision was enacted "to prevent double payment." S. Rept. 93-383, at 3 (1974), reprinted in U.S. Code Cong. & Admin. News 4983 (1974). The term "double payment" implies that Congress considered the salary a pension plan trustee receives from his full-time employer whose employees are covered by the plan, as compensation not only for his employment, but also for his trusteeship.

It is clear from the record that, but for Mr. O'Malley's long-term employment with a trucking company, he would not have been made a trustee of the fund. Because he was already being compensated as a full-time trucking company executive he was precluded from receiving additional compensation from the fund. Under these circumstances we believe that Mr. O'Malley's trusteeship was inextricably tied to his income producing position in the trucking industry.

We also find a significant connection between the activities for which Mr. O'Malley was indicted and his employment in the trucking industry. Mr. O'Malley was indicted for conspiring to bribe Senator Cannon to influence his vote on deregulation legislation. Petitioners introduced credible evidence to support the finding that C.W. was among the many trucking companies which actively opposed deregulation. Deregulation threatened to render worthless the operating authority which the ICC had granted C.W. for certain truck routes, to increase competition in the trucking industry, and to reduce the number of employers contributing to the pension fund, thereby increasing the amount of C.W.'s contribution.

Respondent emphasizes that C.W. did not direct the activities for which Mr. O'Malley was indicted. We do not think this factor is determinative. For example, a taxpayer may be in the trade or business of being an employee and,

as such, may deduct business expenses which no employer directs him to incur. *Primuth v. Commissioner*, 54 T.C. 374 (1970). See also *Jordan v. Commissioner*, 60 T.C. 770 (1973). Expenses resulting from the employee's attempt to secure his position in his trade or business or increase his income therefrom are incurred in his trade or business for purposes of section 162. *Jordan v. Commissioner*, 60 T.C. at 774. Mr. O'Malley was in the trade or business of being an employee of C.W. Deregulation threatened to affect the profitability of Mr. O'Malley's employer, and hence, threatened the security of his employment position. Mr. O'Malley's efforts to thwart deregulation legislation through the bribery scheme, were directly connected with his trade or business as an employee of C.W. Accordingly, the bribery indictment "arose in connection with" or "proximately resulted from" Mr. O'Malley's trade or business. See *United States v. Gilmore, supra* at 48; *Kornhauser v. United States, supra* at 153.

Respondent contends that to consider the effects of deregulation on the trucking industry is to focus on the "potential consequences [of the claim] upon the fortunes of the taxpayer" rather than on "the origin and character of the claim," contrary to the test set out in *United States v. Gilmore, supra.* We disagree. The potential consequences of deregulation on the trucking industry, and Mr. O'Malley's efforts with regard thereto, were the origins of Mr. O'Malley's criminal indictment.

Respondent also contends that this case is controlled by *Glimco v. Commissioner*, 397 F.2d 537 (7th Cir. 1968), affg. a Memorandum Opinion of this Court. In *Glimco,* the taxpayer incurred legal fees in a successful defense to an indictment for violation of the Hobbs Act. In the indictment, the taxpayer was described as an agent and representative of a poultry union. The indictment arose out of the taxpayer's alleged activities in the poultry market. The taxpayer reported no income from his poultry market activities, nor did he show that he conducted these activities with the intention of making a profit. The taxpayer was employed by a taxicab union which paid his legal fees. In disallowing the taxpayer's deduction of legal fees the court specifically noted that:

There was no showing that Taxpayer pursued his poultry market activities as part of his employment with Local 777 [the taxicab union] or to serve its interests. [397 F.2d at 540.]

We have determined that Mr. O'Malley's trusteeship with the pension fund and his role in the conspiracy to bribe Senator Cannon were both related to his employment in the trucking industry. *Glimco* is therefore not controlling in this case.

This case is also distinguishable from *Kurkjian v. Commissioner*, 65 T.C. 862 (1976), and *DePinto v. United States*, 407 F. Supp. 1 (D. Ariz. 1975). In *Kurkjian v. Commissioner, supra*, this Court held that the taxpayer could not deduct legal fees which he incurred in defending several actions brought against him by his church for breach of fiduciary duty. Our holding in *Kurkjian* was based on our finding that the taxpayer was not in the trade or business of rendering services to his church and that he rendered these services gratuitously, motivated by personal and charitable impulses. In *DePinto v. United States, supra*, the court denied the taxpayer's deduction of legal fees and losses arising out of his position as a member of the board of directors of a corporation. The court determined that the taxpayer was not in the trade or business of being a corporate director. He did not receive any money from his position as a corporate director and he became a director at the request of a friend and without any profit motive. Contrary to the facts in the two aforementioned cases, Mr. O'Malley was not engaged in altruistic or personal endeavors when carrying out the activity for which he was indicted. Mr. O'Malley was motivated by business considerations and he undertook this activity in conjunction with his employment in the trucking industry.

Legal fees paid in the unsuccessful defense of criminal charges are deductible if the "origin and character of the claim" test of *United States v. Gilmore, supra*, is satisfied. *Commissioner v. Tellier*, 383 U.S. 687 (1966). The taxpayer in *Commissioner v. Tellier, supra*, was a securities dealer who was indicted for violating the fraud section of a securities act and a mail fraud statute. The taxpayer sought to deduct, under section 162(a), the legal fees he incurred in the unsuccessful defense of his criminal prosecution. In

allowing the deduction, the Supreme Court noted that the income tax laws do not limit deductions for losses to those incurred in a legitimate or lawful business activity. *Commissioner v. Tellier, supra* at 691. The Court reaffirmed the principle that a deduction would be disallowed only where its allowance would frustrate "sharply defined national or state policies proscribing particular types of conduct," and determined that, "No public policy is offended when a man faced with serious criminal charges employs a lawyer to help in his defense." *Commissioner v. Tellier, supra* at 694.

The origin of Mr. O'Malley's indictment for conspiring to bribe Senator Cannon to influence his vote on deregulation of the trucking industry was business related. Mr. O'Malley's unlawful activity was directly connected with his employment as an executive in the trucking industry. Accordingly, petitioners may deduct the legal fees which the pension fund paid on Mr. O'Malley's behalf, as an ordinary and necessary business expense under section 162(a).

## Innocent Spouse

Mrs. O'Malley seeks to be relieved of liability for any deficiency in tax resulting from the omission from petitioners' gross income of the amount of the legal fees paid on Mr. O'Malley's behalf by the pension fund. We have determined that petitioners are entitled to an itemized deduction in the amount of the legal fees paid by the pension fund. In petitioners' case, this will result in no deficiency in tax. On their original 1981 and 1982 income tax returns, petitioners reported itemized deductions in excess of their zero bracket amount. The full amount of the legal fees deducted will reduce adjusted gross income. Accordingly, we need not consider whether Mrs. O'Malley qualifies as an "innocent spouse" under section 6013(e).

*Decision will be entered under Rule 155.*