JAMES A. KERR, JR. AND ERIKA S. KERR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kerr v. Commissioner
Docket No. 31392-86
United States Tax Court
T.C. Memo 1990-155; 1990 Tax Ct. Memo LEXIS 179; 59 T.C.M. (CCH) 193; T.C.M. (RIA) 90155; March 22, 1990
James A. Kerr, Jr., pro se. Jose A. Bonau, for the respondent. PARR
*347 MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies and additions to tax against petitioners as follows: *182 *348 Additions To Tax Year
Deficiency
[1]Section 6653(b) or (b)(1) Section 6653(b)(2)
Section 6661
1981
$ 41,873.94
$ 22,197.97
NA
-0- 1982
$ 11,292.62
$ 5,646.31 *
$ 1,129.26
Respondent concedes the additions to tax for fraud but contends, pursuant to his amended answer, that petitioners are liable for additions to tax under section 6651(a)(1) for 1981, additions to tax under 6653(a)(1) for 1981 and 1982, and additions to tax under 6653(a)(2) for 1981 and 1982. Respondent bears the burden of proof regarding the delinquency and negligence additions. Rule 142(a). After mutual concessions, the issues for decision are whether petitioners' (1) YMCI stock basis, for computing their long-term capital gain, was $ 111,000.00; (2) are entitled to $ 11,235.90 and $ 9,505.75 unreimbursed *183 employee business expense deductions in 1981 and 1982, respectively; (3) are liable for additions to tax under sections 6651(a)(1), 6653(a)(1) and (a)(2), and 6661(a). FINDINGS OF FACT Some of the facts have been stipulated and are incorporated herein by this reference. At the time petitioners filed their petition in this case they resided in Dallas, Texas. During the years in issue, petitioners resided in Jackson, Mississippi. Petitioners filed joint individual Federal income tax returns for calendar years 1981 and 1982 with the Internal Revenue Service Center, Atlanta, Georgia. Timeliness of Filing
Petitioner James A. Kerr, Jr. (hereinafter, "petitioner") personally prepared and hand wrote the joint 1981 and 1982 tax returns. On their 1981 joint Federal income tax return petitioners claimed an $ 18,418.09 refund. There appears, on the signature line of the second page of the return, the date "April 15, 1982" indicating the date petitioners signed such return. The return was due to be filed on or before April 15, 1982. Sec. 6072(a). The face of the return is stamped "RECEIVED MAY 20 1982 ATSC IRS #100". On the bottom of the first page of the return is noted, *184 "POSTMARKED DATE MAY 17 1982". Respondent determined, in his amended answer, that petitioners are liable for a ten-percent addition to tax pursuant to section 6651(a)(1) as the result of their failure to timely file their 1981 tax return. Stock Basis
Petitioner's father, James A. Kerr, Sr. (Kerr, Sr.), began a family business, Kerr Tire and Rubber Company, sometime between 1942 and 1943. The business developed into several separate companies and divisions including, but not limited to, Yazoo Manufacturing Company, Inc. (YMCI), Yazoo Sales Company (YSC), Yazoo Sales Eastern Division [2] (YSED), Kerr Enterprises, Inc. (KEI), Master Sales Company, Inc., Auto Electric and Carburetor, and Yazoo of Texas. Although petitioner worked in the Yazoo family business from the time he was a young child until he graduated from high school, he never received any compensation therefor. It was not until he graduated from the United States Air Force Academy in 1960 that petitioner first learned that he owned ten shares of $ 100.00 par value YMCI stock. The 10 shares had been transferred from Madge *185 Luckett (Mrs. Luckett), an employee of YMCI, to petitioner on September 7, 1960. Mrs. Luckett had originally acquired the ten shares of stock from YMCI on November 1, 1950. Since the stock was purchased directly from Mrs. Luckett, a shareholder, YMCI has no records of the amount, if any, that either petitioner or his father paid to acquire them. The only record YMCI has pertaining to the above transaction is Mrs. Luckett's original cancelled stock certificate, number 9, and the original stock certificate, number 14, YMCI issued on May 31, 1966 in petitioner's name. From June 1960 until 1965, petitioner was commissioned in the Marine Corps. After he resigned his commission in 1965, petitioner obtained his master's degree from the University of Pennsylvania, Wharton School of Business. While attending Wharton, petitioner was employed with YSED and received between $ 8,000.00 and $ 10,000.00 in wages. Petitioner graduated from Wharton in June 1966 and returned to Jackson, Mississippi, to work in the Yazoo family business. Between November 6, 1967 and December 31, 1968, petitioner acquired the following shares of stock:
(1) November 6, 1967: 2500 shares of Yazoo of Texas, *186 zero par value, stock; *349 (2) January 8, 1968: 10,400 shares of YSED's, $ 1.00 par value, common stock; (3) February 28, 1968: 1300 shares of Yazoo of Texas stock. (4) October 31, 1968: 1 share of Master Sales company zero par value, stock; (5) December 31, 1968: 5 shares of KEI stock, $ 100.00 par value, transferred from Kerr, Sr. [3]KEI has no record of the amount, if any, petitioner paid for the 5 shares of stock since the transfer was made by a shareholder and not by the corporation.
Kerr, Sr. died on August 18, 1969, and, petitioner and other family members, assumed the responsibility of running all Yazoo related businesses. Petitioner's uncle, O. H. Kerr, was President of YMCI and petitioner's mother, although hospitalized and inactive, was the majority shareholder. Petitioner did not acquire any of the shares here in issue as the result of a transfer from his father's estate. On December 31, 1972, pursuant to a plan of reorganization, YSC merged into YMCI. At the time of the merger, petitioner did not *187 own any YSC stock and did not receive any YMCI stock as a result of the merger. Before December 1974, a plan of reorganization was instituted to combine all Yazoo related companies and create one large company, YMCI. Pursuant to said plan the following occurred: (1) June 11, 1974, Yazoo of Texas Inc. redeemed petitioner's 3,800 shares for $ 7,600.00; (2) April 26, 1974 petitioner transferred to YMCI his only share of Master Sales Company, Inc. stock and, on February 27, 1975, received $ 275.82 in return; and (3) February 27, 1975, KEI purchased petitioner's only share of Auto Electric & Carburetor, Inc. for $ 415.36. After the above redemptions and purchase transactions occurred, petitioner's total stock holding in Yazoo's remaining related companies consisted of five shares of KEI stock and ten shares of YMCI stock. On March 27, 1975, the shareholders and directors of KEI held a special joint meeting to consider the proposed merger of KEI, YMCI and Yazoo of Louisiana, Inc. into KEI. The board of directors unanimously adopted the plan and the shareholders unanimously approved the plan. On June 25, 1975 and in accordance with the plan of reorganization, YMCI merged into KEI *188 and petitioner received 22 shares of KEI stock in exchange for his ten shares of YMCI stock plus $ 200.00 [4] in cash. After the June 25th transaction, petitioner owned a total of 27 shares of KEI stock consisting of the 22 shares just received plus the 5 shares he acquired from his father on December 31, 1968. On July 1, 1975, KEI shareholders unanimously adopted the resolution that the name of KEI be changed to YMCI and that the authorized capital of the corporation be increased to $ 500,000.00. As the final step in the plan of reorganization, petitioner surrendered his 27 shares of KEI to YMCI and on October 7, 1975, YMCI, the only company remaining after the merger or reorganization of all Yazoo related companies, issued 27 shares of its stock to petitioner. On September 1, 1981, YMCI was sold to Robert Hearin (Mr. Hearin) for approximately *189 $ 9 million. As the owner of 27 shares of YMCI stock, petitioner, on September 2, 1981, surrendered such stock, in accordance with the June 30, 1981 Stock Purchase Agreement, section 3, in exchange for $ 149,600.00. On their 1981 return, petitioners reported a $ 38,600.00 long-term capital gain on the sale of their 27 shares of YMCI stock, computed as the difference between the $ 149,600.00 sales price and a $ 111,000.00 basis. In his notice of deficiency respondent determined that petitioners failed to substantiate their stock basis and further determined that the gain be computed using a basis of zero. The use of the zero basis results in long-term capital gain being increased by $ 44,400.00 from $ 12,402.40 to $ 56,802.40. At trial, respondent conceded that the basis was not zero but alleged that the maximum basis petitioner was entitled to was $ 200.00. Employee Business Expenses
From January 1, 1981 through September 1, 1981, petitioner was Vice President, a shareholder, and a director of YMCI. From September 2, 1981 through December 31, 1982, petitioner served as President of YMCI. Before and during 1981 and 1982 YMCI's policy was to reimburse all business expenses *190 incurred by employees at petitioner's level. There was no limitation on the amount or whether the expense was incurred in- or out-of-town. It was not YMCI's policy to reimburse employees for taking non-employee spouses or other family members on YMCI business trips. Such expenses were not considered to be ordinary and necessary business expenses. However, *350 it was not until after Mr. Hearin purchased YMCI in September, 1981 that a written memorandum was issued amplifying and clarifying that fact. Included among the employee business expenses YMCI traditionally reimbursed or paid directly, were airfares, hotel and motel lodging, meals, gasoline, postage, picture/film, and entertainment. To obtain reimbursement YMCI required each employee to fill out an expense report detailing amounts incurred in particular categories per day, advances, credit card charges, and airfares. Additionally, YMCI required employees to submit original receipts, invoices, cash tickets or credit card statements as "backup" documentation. If an employee failed to attach a receipt or submit an expense report, YMCI did not reimburse him or her. YMCI did not expect or require its employees to personally incur *191 and pay any business expenses beyond those reimbursed. When YMCI received an expense report, Louise Jones (Mrs. Jones), an employee of YMCI since 1954, [5] reviewed it for mathematical accuracy and then sent it to O. H. Kerr (before September 1, 1981) or Howard Day (after September 1, 1981) for approval. If an expense was business related, YMCI reimbursed the employee for any out-of-pocket expenses. If the employee had received a cash advance and the expenses were less than the amount advanced, the employee would "reimburse" YMCI for such excess. If an expense was determined to be unrelated to any business of YMCI, the company did not reimburse the employee. If, however, YMCI had already paid the expense via credit card or cash advance, the employee was required to reimburse YMCI. YMCI usually advanced funds directly to petitioner, either before his out-of-town business trips, or *192 before the arrival of out-of-town business associates when it was anticipated that business-related expenses, including entertainment, would be incurred. YMCI also issued petitioner a corporate bank credit card [6] and telephone calling card as additional means by which he could pay YMCI's business expenses he incurred. In accordance with YMCI's reimbursement policy, if petitioner spent less than the funds advanced, upon submission of a detailed expense report, he returned the unspent funds. If, however, his business expenses exceeded the advance, YMCI reimbursed him. As a result of, and consistent with, YMCI's reimbursement policy, YMCI paid in excess of $ 22,000.00 of the employee business expenses petitioner claimed in 1981 and 1982. Petitioners voluntarily incurred additional expenses during 1981 and 1982 without accounting to YMCI or claiming reimbursement therefor, even though some were the type of expenses YMCI traditionally reimbursed, i.e., gas, food, lodging, meals, and entertainment. As a result, *193 petitioners claimed income tax deductions of $ 13,740.42 and $ 12,996.68 in 1981 and 1982, respectively. In the notice of deficiency, respondent disallowed these deductions as not constituting ordinary and necessary business expenses, or as not being required by the employer, or as constituting nondeductible personal living or family expenses, and/or for lack of adequate substantiation. After all concessions, petitioners now claim that they are entitled to deduct the following as employee business expenses for 1981 and 1982 respectively: 1981
Gas -
$ 453.21   Food -
$ 1,380.63 * Pictures -
$ 482.61   Postage -
$ 74.24    Courthouse -
$ 877.29 **  Legal -
$ 284.75   Entertainment -
$ 49.00    Cleaning -
$ 35.23    Education -
$ 237.13   Gifts -
$ 239.64   Air Fare -
$ 4,014.21 Lodging -
$ -0-*      Miscellaneous -
$ 3,107.96 $ 11,408.34
*351 *194 1982
Gifts -
$ 364.45   Food -
$ 963.15   Gas -
$ 191.22   Courthouse -
$ 607.69 **   Education -
$ 62.95    Cleaning -
$ 40.64    Postage -
$ 35.86    Telephone -
$ 284.73   Film -
$ 239.42   Security -
$ 346.50   Miscellaneous -
$ 567.48   Travel -
$ 5,801.66 9,505.75   OPINION Stock Basis
The first issue for decision is whether petitioners, for purpose of computing their long-term capital gain, have carried their burden of proving that their YMCI stock basis was greater than $ 200.00. See Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Section 1011(a) provides that "The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections * * *), * * * adjusted as provided in section 1016." Section *195 1012 provides that "The basis of property shall be the cost of such property, * * *." Section 1015 provides that, in the case of property acquired by gift, the basis, for purposes of determining gain or loss, shall be the same as it was in the hands of the donor or the last preceding owner by whom it was not acquired by gift, except, if the basis is greater than the fair market value of the property at the time of the gift then for purposes of determining loss the basis is the fair market value at the time of the gift. Petitioners allege that the basis of the 27 shares of YMCI stock was actually $ 118,000.00, determined by adding the following amounts: (1) $ 10,000 petitioner paid his father for Mrs. Luckett's ten shares of YMCI stock; (2) $ 20,000 petitioner paid his father for five shares of KEI stock; and (3) $ 88,000 petitioner "paid" for his 10,400 shares of YSED stock. Respondent, on the other hand, contends that petitioner has only proved that he actually expended $ 200.00 and, therefore, the maximum basis attributable to the 27 shares of YMCI stock is $ 200.00. To decide whether petitioners have carried their burden we must first determine the composition of the 27 shares *196 of YMCI stock, the date they were acquired, and how they were acquired. It is clear, based upon the all the evidence presented, that the 27 shares of YMCI stock in issue consisted only of the 10 shares of YMCI stock transferred from Mrs. Luckett to petitioner on September 7, 1960, plus the five shares of KEI stock transferred from Kerr, Sr. to petitioner on December 31, 1968, plus the $ 200.00 petitioner paid KEI on June 25, 1975 for his .094 fractional share of KEI stock. Therefore, to the extent petitioner alleges that his Master Sales Company, Inc., Auto Electric and Carburetor, Inc., and Yazoo of Texas, Inc. stock increase his YMCI stock's basis we disagree. Ten shares of YMCI stock: $ 10,000.00
At trial, petitioner alleged that he had a $ 10,000 basis in the ten shares of YMCI stock he acquired on September 7, 1960 because he either paid his father $ 10,000.00 outright or his father transferred the stock to him in lieu of compensation. Petitioner testified he arrived at the $ 10,000.00 value based on a conversation with his father, wherein his father told him that petitioner owned 10 shares of YMCI stock and that it cost him $ 10,000.00. Petitioner also testified *197 that he had no personal knowledge of how his father obtained the shares from Mrs. Luckett, how much was paid, or anything else regarding the transfer and, therefore, relies solely upon the statement his father made to him in order to establish that the YMCI stock had a $ 10,000.00 basis in his hands.
I am simply saying that there is a basis, that it cost me something, and I paid for it. Now, whether it was a check or whether it was a gift, whatever, I have no way of saying * * *." [TR. 35, ln. 16.] It cost me $ 10,000, and he said I paid for it. And I said, Fine. [TR. 50, ln. 5-7.] Now, how I paid him and how I got it done is, it has either got to be in his eyes a gift -- I don't know how he arranged it -- or I worked for it and he paid me that way." [TR. 49, 4-7.]
Respondent, on the other hand, contends that petitioners have failed to prove either (1) that petitioner actually paid his father $ 10,000.00 for the shares, (2) that petitioner received the shares in lieu of compensation and included the fair market value in his income in the year he received them, or (3) that petitioner received the shares as a gift from his father and that his father had a basis of $ *198 10,000.00. We agree with respondent. The record is completely devoid of any corroborating evidence from which we can determine what amount, if any, petitioner or his father paid to acquire Mrs. Luckett's stock. Petitioner was unable to produce a check or any other documented evidence substantiating his allegation that he paid his father $ 10,000.00 for the stock or that his father paid Mrs. Luckett $ 10,000.00. Petitioner has also failed to introduce any evidence corroborating the fact that he received the stock in lieu of compensation and properly included the fair market value of the stock in his income. Moreover, the stock certificates themselves, evidencing the transfer of the stock from Mrs. Luckett to petitioner, fail to reveal the amount Mrs. Luckett received as consideration therefor. *352 Petitioner really does not know how he acquired the stock. Nevertheless, we believe that no matter how petitioner acquired it, either by gift or purchase, his basis is at least equal to Mrs. Luckett's, i.e., par value. Joplin v. Commissioner, 17 T.C. 1526, 1532 (1952). See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Under the circumstances here, *199 we find it appropriate to apply the Cohan rule of approximation and find petitioner has a $ 1,000.00 basis. [7]
Five shares of KEI stock: $ 20,000.00
Petitioner testified that he paid his father $ 20,000.00 as part of a negotiated deal to acquire the "Munger" part of the company. The $ 20,000.00 purportedly consisted of bonuses earned between 1967 and 1968 and monies earned from commissions while managing YSED while attending graduate school. We are not convinced, however, that petitioner actually paid his father anything for the five shares of stock. First, petitioner is unable to produce the $ 20,000 check to his father. KEI's stock records neither establish the amount petitioner paid for such shares nor the donor's basis if petitioner acquired them by gift. However, we believe petitioner's father had at least a $ 500 basis in these shares. Joplin v. Commissioner, supra; Cohan v. Commissioner, supra.Accordingly, we find petitioner's basis to be $ 500. 10,400 shares of YSED stock: $ 88,000.00
Petitioner alleges that the basis of the 27 shares *200 of YMCI stock should somehow reflect the purported $ 88,000.00 basis he had in his YSED stock, since YSED merged into YSC and YSC merged into YMCI. In support, petitioner alleges the following: After his father's death he, as the owner of YSED, and as president of YSC, merged the two companies. YSC agreed to purchase his YSED stock for $ 88,000.00, but he was never paid. Instead, YSC arranged for petitioner to receive credit for said amount when YSC merged with YMCI. As a result of YSC's merger into YMCI, his basis in the 27 shares of YMCI issued to him 3 years later reflects the $ 88,000.00 basis he had in his YSED stock. We believe petitioner's testimony to the extent that YSED merged into YSC. Furthermore, even though Mrs. Jones testified that petitioner did not own any YSC stock before its December 1972 merger with YMCI, we nonetheless believe petitioner received credit for said shares when YSC merged with YMCI. Therefore, we find that the YSED stock basis should be considered in determining the basis in his 27 shares of YMCI stock. However, we do not believe petitioner proved an $ 88,000.00 basis. Petitioner alleges that he "paid" a total of $ 88,000.00 for his stock *201 and presents three separate and distinct theories as proof. First, petitioner states YSED had a sole distributor contract before it merged with YSC, and, as a result of the merger, he gave up said contract. Petitioner then values the contract at $ 88,000.00. Next, petitioner states that he personally paid approximately $ 88,000.00 of YSED's debts and thereby increased his YSED stock basis by the same. Finally, petitioner alleges that he paid $ 87,500.00 for the stock when his father incorporated YSED, and $ 500.00 to acquire Sidney Dupry's shares before YSED merged with YSC. We find these theories inconsistent and totally unpersuasive. We believe, however, petitioner's basis was at least equal to par value. Therefore, we estimate and find his basis to be $ 10,400.00, whether acquired by gift or by purchase. Cohan v. Commissioner, supra.
Based upon the forgoing, we conclude petitioner proved a basis of $ 12,100.00, and hold accordingly. Employee Business Expense Deductions
The next issue for decision is whether petitioners are entitled to deduct, as employee business expenses, any of the amounts claimed on their 1981 and 1982 returns and not previously *202 conceded. Section 162(a) allows a deduction for all the ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business. Performance of services as an employee constitutes a trade or business. See O'Malley v. Commissioner, 91 T.C. 352 (1988). Therefore, a deduction for entertainment, transportation, lodging, office, and any other customary business expenses is appropriate if the "ordinary and necessary" test is otherwise satisfied. The term "ordinary and necessary business expenses" means only those expenses which are commonly incurred in, appropriate or helpful to, and directly connected with the conduct of the taxpayer's trade or business. Sections 1.162-1(a) and 1.162-17(a), Income Tax Regs. See Welch v. Helvering, supra. The term neither includes expenses which are personal in nature, such as personal living or family expenses disallowed by section 262, see sections 1.162-17(a) and 1.274-5(e)(1), *203 Income Tax Regs., nor expenses, the type which an employer traditionally reimburses, where the employee fails to seek reimbursement. Orvis v. Commissioner, 788 F.2d 1406 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Coplon v. Commissioner, 277 F.2d 534, 535 (6th Cir. 1960), affg. a Memorandum Opinion of this Court; Leamy v. Commissioner85 T.C. 798 (1985); Kennelly V. Commissioner, 56 T.C. 936, 943 (1971), affd. without opinion 456 F.2d 1335 (2d Cir. 1972). *353 When an employer has a plan for reimbursing certain employee expenses, and the employee fails to seek reimbursement, such failure results in the disallowance of a deduction for such expenses, since the expense in not considered "necessary" in order for the taxpayer to perform his trade or business of being an employee, i.e., it is not necessary for an employee to remain unreimbursed for expenses to the extent he could have been reimbursed. Orvis v. Commissioner, supra; Heineman v. Commissioner, 82 T.C. 538, 545 (1984); *204 Lucas v. Commissioner, 79 T.C. 1, 7 (1982); Podems v. Commissioner, 24 T.C. 21 (1955). Furthermore, the mere failure by an employee/taxpayer to seek reimbursement cannot convert the employer's expenses into the employee's. Kennelly v. Commissioner, supra.
Therefore, an employee who wishes to deduct employee business expenses in excess of the amounts paid directly by his employer or received from his employer as advances, reimbursement, or otherwise, must establish that they are ordinary and necessary business expenses of the taxpayer's trade or business of being an employee, of earning his salary and/or carrying on his executive duties. Coplon v. Commissioner, supra; Kennelly v. Commissioner, supra; Stolk v. Commissioner, 40 T.C.345 (1963), affd. 326 F.2d 760 (2d Cir. 1964). Petitioner alleges that (1) YMCI's reimbursement policy before and after September 1, 1981 did not provide for the reimbursement of business expenses incurred while in Jackson, and therefore, any locally incurred business expenses are properly deductible by him, and (2) he has sufficiently substantiated *205 the fact that the expenses claimed as employee business expenses in 1981 and 1982 are deductible. Respondent, on the other hand, contends that the claimed expenses were not ordinary and necessary since they represent either (1) the type of employee business expenses YMCI traditionally reimbursed had petitioner sought reimbursement, or (2) nondeductible personal living expenses. We agree with respondent. Most of the expenses claimed are the type YMCI traditionally reimbursed. In fact, in 1981 and 1982, petitioner was reimbursed for expenses of the same type as those in issue here. Moreover, the evidence shows that YMCI reimbursed all expenses, including those incurred locally, even though petitioner alleges the contrary. We conclude that the items petitioners deducted as gifts, food, gas, pictures/film, postage, legal, lodging, entertainment, cleaning, telephone, security, miscellaneous [for 1981 and 1982], and $ 772.23 of travel (1982), constitute nondeductible expenses, since they either could have been or already had been reimbursed or were not "necessary" under section 162(a). With respect to the remaining expenses, i.e., "Courthouse" "Education" (1981-1982), "Air Fare" *206 (1981), and $ 4,118.43 of "Travel" (1982), petitioners have failed to prove such expenses were "necessary" or to properly substantiate such expenses in accordance with section 274 and the regulations thereunder. Courthouse
Petitioner deducted $ 877.29 and $ 607.69 in 1981 and 1982, respectively, as fees and dues he incurred as a member of the "Courthouse" athletic facility. To be entitled to deduct expenses associated with the use of an athletic club petitioner must (1) prove that it is an ordinary and necessary business expense and (2) satisfy the substantiation requirements of section 274(a)(1)(B), and the applicable regulations thereunder. See sections 1.274-2(a)(2)(ii)(a) and (b), and 1.274-5(c)(6)(iii), Income Tax Regs.
Section 1.274-2(a)(ii), Income Tax Regs., states in pertinent part:
no deduction otherwise allowable under chapter 1 of the Code shall be allowed for any expenditure paid or incurred . . . with respect to a club used in connection with entertainment, *207 unless the taxpayer establishes -- (a) That the facility or club was used primarily for the furtherance of the taxpayer's trade or business, and (b) That the expenditure was directly related to the active conduct of that trade or business.
Petitioner alleges that his membership in "Courthouse" was necessary in order for him to "visit with suppliers, his transportation man, his customers, his fork lift man and his advertising folks." He stated he did not need the exercise, only the time to be alone with those substantial people to get Yazoo business done. Petitioner's evidence falls far short of that required by section 274. Even if such expenses constituted valid employee business expenses petitioner would still have to satisfy the substantiation requirements, which he has failed to do. If a taxpayer fails to maintain adequate records with respect to a facility which is likely to serve the personal purposes of the taxpayer and his family, it shall be presumed that the use of such facility was primarily personal. Section 1.274-5(c)(6)(iii), Income Tax Regs.
*208 We find petitioner's Courthouse expenses were personal. Education
Petitioner alleges that the payments to "Trim", " The World Book Year", "U.S. News *354 and World Report", "The Knapp Press", "Reader's Digest", "American Opinion", "The Review of the News", his membership dues in the John Birch Society, and hunting and fishing licenses are all deductible as unreimbursed employee business expenses. Respondent, on the other hand, contends that petitioners have failed to establish a business purpose for incurring the expenses. We agree with respondent. Air Fare: Family Travel
In 1981 and 1982, petitioners deducted $ 4,014.21 and $ 5,029.43, respectively, as employee business expenses representing airfares, meals, lodging, and other expenses incurred by Mrs. Kerr and petitioners' children while accompanying petitioner on business trips. [See Appendix A.] It was YMCI's policy not to reimburse an employee for any expense incurred by nonemployee family members when they accompanied employees on business trips, since YMCI did not consider their presence necessary to conduct its business. In fact, YMCI required petitioner to reimburse it for such expenses it paid. *209 Petitioner must thus prove that his family's travel was an ordinary and necessary part of his trade or business of being an employee, i.e., earning a salary and/or carrying on his executive duties. Stolk v. Commissioner, supra.
Section 1.162-2(c), Income Tax Regs. provides that:
Where a taxpayer's wife accompanies him on a business trip, expenses attributable to her travel are not deductible unless it can be adequately shown that the wife's presence on the trip has a bona fide business purpose. The wife's performance of some incidental service does not cause her expenses to qualify as deductible business expenses. The same rules apply to any other members of the taxpayer's family who accompany him on such a trip.
Petitioner alleges that Mrs. Kerr's presence at the Outdoor Power Equipment Institute (OPEI) meetings, especially the meeting in Brussels, was vital to his trade or business of being an executive of YMCI. He states that Mrs. Kerr was invited to Brussels by OPEI to sponsor the American National Safety Institute and to represent them as secretary, and because Mrs. Kerr is *210 bilingual, she was able to help translate during the meetings. Under these special circumstances we agree that Mrs. Kerr's presence in Brussels served a bona fide business purpose since she provided services directly and primarily related to petitioner's business by facilitating communication with the Europeans present and by taking on the specific duties connected with OPEI meeting. Cf. Anchor National Life Insurance Co. v. Commissioner, 93 T.C. 382, 431-432 (1989). See sec. 274(c). However, with respect to all other trips, although Mrs. Kerr's presence may have been helpful and beneficial to petitioner, no bona fide business purpose was proved. Being "helpful" is not enough; a wife's or child's functions while traveling with petitioner must be "necessary" to the conduct of his business before a deduction will be allowed for their expenses. United States v. Gotcher, 401 F.2d 118, 124 (5th Cir. 1968); Moorman v. Commissioner, 26 T.C. 666 (1956). See Anchor National Life Insurance Co. v. Commissioner, supra. *211 With respect to the expenses of their children, Mrs. Kerr testified that they always helped out with all aspects of the Yazoo family business, without receiving compensation therefore, because they believed the business would be theirs one day. This is not evidence that the presence of the children was in any way "necessary" to petitioner's trade or business of being an executive or employee. We conclude that only Mrs. Kerr's expenses to the Brussels meeting are deductible. Additions to Tax
Section 6653(a)(1) and (a)(2)
The next issue for decision is whether petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (a)(2). Since these additions were asserted by respondent in his amended answer, he bears the burden of proving by a preponderance of the evidence that the underpayment of tax is due to petitioners' negligence or their intentional disregard of the rules and regulations. See Rule 142(a). Negligence is defined as the lack of due *212 care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners stipulated that for taxable year 1981, the disallowed $ 21,770.00 Schedule C expenses for "Shaklee Distributorship" is attributable to negligence for purposes of section 6653(a)(1) and further stipulated that at least $ 21,770.00 is attributable to negligence for purposes of computing the addition to tax under section 6653(a)(2). Respondent contends that petitioners are liable for the section 6653(a) additions attributable to the following additional items: In 1981 petitioners deducted (1) $ 3,341.37 as employee business expenses related to Nicole's modeling activity; (2) $ 15,065.92 interest expense substantiating *355 only $ 4,930.91; (3) $ 7,908.35 charitable contributions substantiating only $ 4,800.00. In 1982 petitioners deducted $ 6,916.75 charitable contributions, substantiating only $ 4,979.00. Respondent also contends that petitioner's failure to adequately *213 maintain records, in light of his education and business experience further supports a finding of negligence. We agree. Petitioners failed to exercise due care by (1) claiming deductions in excess of what they could adequately substantiate, as required by section 6001 and the regulations promulgated thereunder; (2) failing to further inquire into the appropriate treatment of the unreimbursed employee business expenses; (3) taking deductions for personal expenses; and (4) claiming a stock basis which they could not adequately substantiate. Therefore, we find that petitioners are liable for the section 6653(a)(1) and (a)(2) negligence additions for 1981 and 1982. The additions shall apply to the entire deficiency redetermined above. Section 6651
The next issue is whether petitioners are liable for a 10 percent addition to tax under section 6651(a)(1) for failure to timely file their Federal income tax return for 1981. Respondent bears the burden of proof on this issue. Wayne Coal Mining Co. v. Commissioner, 209 F.2d 152 (3d Cir. 1954), affg. a Memorandum Opinion *214 of this Court; Rule 142(a). He thus must show not only that petitioners' return for 1981 was filed late, but also that the late filing was due to "willful neglect" and not due to "reasonable cause," within the meaning of section 6651(a)(1). Gardner v. Commissioner, T.C. Memo. 1987-420, affd. without published opinion 884 F.2d 1392 (6th Cir. 1989), Bruner Woolen Co. v. Commissioner, 6 B.T.A. 881, 882 (1927). Reasonable cause has been defined as the exercise of "ordinary business care and prudence." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect is a conscious, intentional failure or reckless indifference. United States v. Boyle, 469 U.S. 241 (1985). Respondent relies on the Internal Revenue Service Center "date received" stamp and the "postmark date" notation appearing on the 1981 return, to prove that petitioners' return was not mailed until May 17, 1982 or received until May 20, 1982. Respondent's only "evidence" that petitioners lacked reasonable cause, was, in essence, that we should not believe petitioners' testimony as to the events surrounding their filing of the 1981 return, since other *215 evidence presented by petitioners was inconsistent and therefore unreliable. We are not persuaded. Respondent has failed to carry his burden of proof on this issue. We hold that no addition to tax under section 6651(a)(1) is imposed. [8]
Section 6661(a)
The last issue is whether petitioners are liable for the addition to tax under section 6661(a) for substantial understatement of income tax with respect to their tax year 1982. Petitioners bear the burden of proof on this issue. Rule 142(a). An understatement *216 is substantial if it exceeds the greater of $ 5,000.00 or 10 percent of the amount required to be shown on the return. The amount of the understatement is reduced for section 6661 purposes by the portion of the understatement which is attributable to the taxpayer's treatment of an item for which there was "substantial authority," or if the relevant facts affecting the item's tax treatment are "adequately disclosed" on the return or in a statement attached thereto. Sec. 6661(b)(2)(B)(i) and (ii). In his notice of deficiency, respondent determined that, due to the adjustments made to petitioners' 1982 joint Federal income tax return, they were liable for a ten percent addition to tax pursuant to section 6661(a). Petitioners did not offer "substantial authority" for their understatement nor did they "adequately disclose" any facts affecting the tax treatment of the items in issue. Accordingly, they are liable for the addition to tax under section 6661. The Omnibus Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951, increased the section 6661(a) addition to *217 tax to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after October 21, 1986. Respondent, however, has not amended his answer to seek an increase to such addition to tax over the amount determined in the notice of deficiency. Accordingly, we sustain respondent's determination as set forth in the notice of deficiency. To reflect the foregoing and concessions by both parties, Decision will be entered under Rule 155. *356 APPENDIX A 1981
1.
$ 1,842.21 *
-
for Mrs. Kerr's air fare to Europe
2.
$ 2,172.00 *
-
air fare for Mrs. Kerr and children to
Muskegon
$ 4,014.21
1982
1.
$ 911.00  -
air fare for Mrs. Kerr to Brussels to
attend OPEI Meeting
2.
$ 2,676.00 *
-
air fare for Mrs. Kerr and children to
attend an OPEI meeting in California.
3.
$ 175.00  -
Registration for everyone to the OPEI
meeting in California
4.
$ 200.00  -
Room Deposit for OPEI meeting
5.
$ 708.79  -
Lodging during OPEI meeting, La Costa
Resort
6.
$ 103.42  -
Lodging in Colorado
7.
$ 53.29   -
Lodging in Oakland
8.
$ 143.63  -
Lodging in Phoenix
9.
$ 58.30   -
Lodging in Santa Barbara
$ 5,029.43 *218 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and in effect for 1981 and 1982. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on $ 11,292.62. ↩
2. Kerr, Sr. subsequently incorporated YSED sometime between 1966 and January 8, 1968.↩
3. Kerr, Sr. had been issued 500 shares on April 1, 1959 and on December 31, 1968 he transferred 5 to petitioner leaving him with 495 shares.↩
4. It was determined that petitioner was entitled to receive 21.904 shares of KEI stock for his ten shares of YMCI stock and that for an additional payment of $ 200.00, petitioner would receive a total of 22 shares of KEI stock. The $ 200.00 represents the cost to petitioner of purchasing the .096 fractional share of KEI stock.↩
5. During Mrs. Jones' employment with YMCI she worked in various capacities, including expense accounts and reimbursements. She was familiar with YMCI's policy and what type of expenses were considered business or nonbusiness. In 1981 and 1982 she was in charge of the reimbursement program.↩
6. Prior to and during 1981, an American Express card was used. Sometime after Mr. Hearin purchased YMCI the American Express card was replaced with a VISA bank card.↩
*. Takes into account petitioners concessions on brief, with respect to the $ 82.44 food and $ 90.00 lodging expenses. ↩
**. Courthouse is an athletic facility of which petitioner is a member. These expenses represent membership fees and monthly dues.↩
**. Courthouse is an athletic facility of which petitioner is a member. These expenses represent membership fees and monthly dues.↩
7. See Dockery v. Commissioner, T.C. Memo. 1978-63↩.
8. We note however, that if the burden of proof had been upon petitioners to show that their failure to file on time was "due to reasonable cause and not due to willful neglect," their explanation might well not be sufficient to relieve them of the ten-percent addition to tax. See United States v. Boyle, 469 U.S. 241 (1985); Gardner v. Commissioner, T.C. Memo. 1987-420, affd. without published opinion 884 F.2d 1392↩ (6th Cir. 1988).
*. These expenses petitioner paid directly to Avanti Travel, all other expenses were initially paid by YMCI and petitioner was therefore required to reimburse it.↩